**UNITED STATES of America,**
**Appellant,**

**v.**

**Robert Rutherford BOND and Margaret**
**E. Bond, Appellees.**

**No. 16954.**

United States Court of Appeals
Fifth Circuit.

July 18, 1958.

David O. Walter, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice,

Asst. Atty. Gen., John N. Stull, Acting Asst. Atty., Lee A. Jackson, Harry Baum, Attys., Washington, D. C., William B. Butler, U. S. Atty., Houston, Tex., for appellant.

George O'Brien John, Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

John R. BROWN, Circuit Judge.

The question here is whether amounts paid by Taxpayer to a Texas life insurance company under an Annuity Savings Bond and Annuity Loan Note were deductible as interest under Section 23(b) of the Internal Revenue Code [1] of 1939. In the suit for refund, the District Court held for the Taxpayer.

The facts are uncontradicted and were largely stipulated. The Taxpayer in December 1952 purchased [2] from the Sam Houston Life Insurance Company (in Texas) a single-premium, thirty-year maturity, Annuity Savings Bond of a stated guaranteed cash value of $209,700 at maturity at a premium cost of $100,100 of which he paid $100 in cash and executed an Annuity Loan Note in the amount of $100,000. The Note provided that interest be paid in advance at the rate and as provided in the Bond. During 1952 Taxpayer paid as interest $2,750 at the rate of 2¾% of the principal amount of the Note.

Under the Annuity Bond, the Company agrees to pay, on the thirtieth anniversary, an annuity of $1,830.68 per month with a Cash Value on the Original Maturity Date of $209,700. At any time before the thirty-year Maturity Date, the annuitant may elect to receive in

---

1. "§ 23. Deductions from gross income.
   "In computing net income there shall be allowed as deductions:
   \* \* \* \* \*
   "(b) *Interest.* All interest paid or accrued within the taxable year on indebtedness, \* \* \*."
   26 U.S.C.A. § 23.

2. Actually there were seven of these Bonds with identical terms purchased simultaneously. It facilitates discussion to treat one Bond separately. The total interest for the seven Bonds aggregated $19,250. Taxpayer's age was 49 at the time.

a single sum the *net* cash value at the time, or to receive a reduced annuity computed, according to the then age of the annuitant, upon the *net* cash value. There are various alternatives on the death of the Bondholder. If after payments start, the Bondholder dies, payments will continue to the beneficiary; if she dies, payments will be made to the estate of the last to die of the Bondholder or beneficiary. In either event, the aggregate sum payable will be the *net* cash value on maturity of the Policy. If the Bondholder or Annuitant dies before the Maturity Date, a death benefit will be paid to the beneficiary or to his estate of the then *net* cash value.

The Cash Value was determined by a table [3] in the Bond specifying the Cash or Loan Value at the end of each contract year from 1 through 30. The term "Net Cash Value" was defined to "mean the Cash Value * * * on the date as of which it is being computed and decreased by the amount of any indebtedness to the Company against this Contract."

The Annuity Loan Note recites the receipt of $100,000 advanced by the Company "as a loan on the sole security of and in accordance with the provisions contained in Annuity Savings Bond Number * * *," and which sum the Company is directed to apply to pay the remaining premiums of the Annuity Savings Bond. The Maker of the Note expressly assigns the Annuity Savings Bond and all sums due under it to the Company as security for the repayment of the loan and interest. Interest is payable at the rate and at the time provided in the Bond. The principal of the loan becomes due and payable whenever the Bond shall become due and payable or whenever the total indebtedness on the Bond shall equal or exceed the guaranteed Cash Value of the Bond. In the event the Bond lapses or becomes forfeited, the amount of the Loan with interest is to be deducted from any Cash Surrender Value of the Bond. It expressly states " * * * that there is no personal liability upon the makers of this note for the payment thereof, the sole recourse being against the said Annuity Savings Bond."

Taking as its dominant theme, which recurs in major and minor key, the oft-quoted generality, frequently repeated with an uncritical regard for the case which gave it birth, that "as respects 'interest,' the usual import of the term is the amount which one has contracted to pay for the use of borrowed money," Old Colony Railroad Co. v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 214, 76 L.Ed. 484, 489, and its paraphrase that "In the business world 'interest on indebtedness' means compensation for the use or forbearance of money," Deputy v. Dupont, 308 U.S. 488, 498, 60 S. Ct. 363, 368, 84 L.Ed. 416, 424, the Government insists that this is not an indebtedness. The annual payments, denominated interest, are something else since no money was loaned or borrowed nor were other economic benefits actually advanced to Taxpayer by the Company. On this approach, if this is not indebtedness, the annual payment could not be interest, and since neither of the dual requirements of Section 23(b), note 1, supra, is present, the meaning, application, or historical development of Section

3. For a $100,000 premium Bond, the Table showed the following Cash Value (Col. 2) from which Net Cash Value (Col. 4) is determined automatically by deducting the Annuity Loan Note of $100,000 (Col. 3):

| (1)<br>End of<br>Contract Year | (2)<br>Cash or<br>Loan Value | (3)<br>Amount of<br>Indebtedness | (4)<br>Net<br>Cash Value |
|---|---|---|---|
| 1 | $102,500 | $100,000 | $ 2,500 |
| 10 | 128,000 | 100,000 | 28,000 |
| 16 | 148,500 | 100,000 | 48,500 |
| 30 | 209,700 | 100,000 | 109,700 |

24(a) (6) of the 1939 Code [4] is of no importance at all.

■ In the determination of the interest status of these annual payments, it is not, in our view, proper to divorce Section 23(b) from Section 24(a) (6) since both are a part of a single Code coming to bear here on a single subject. That being so, a proper regard for the historical development of these Code provisions as well as the intrinsic nature of this Annuity Bond contract will establish that the District Judge was right in declaring this to be deductible interest.

The Government would have us believe that this was an artificial transaction with nothing but a swapping of ostensible interest charges and offsetting credits or payments. Since the amount of the Note, representing the premium, must first be deducted, it is claimed that the so-called Cash Value is an illusion, that the Taxpayer could not derive any benefit from it, nor could the Company retain or invest it as it saw fit or lend it to Taxpayer or others as money belonging to the Company. This is especially true, it says, since payment of the Note is secured solely by assignment of the Bond without personal liability of the Maker.

The Government contrasts this to the case in which, prior to the 1954 Code, see note 20, *infra,* one desiring to procure a single premium Annuity could borrow the full amount of the premium from a bank, use the proceeds to pay the premium to the company and deduct the interest. It is not at all articulate in pointing out what are the distinguishing comparative factors.[5] We could hardly believe that they are the fact that no money actually passes, that a check from the lender is not issued, deposited by the borrower, and then a new check in payment of the single premium drawn by lender and delivered to the company issuing the Annuity Bond. Nor can the mere fact that the Maker of the Note has no personal liability deprive the annual payment of its interest status.[6]

■■ But this Bond is not the mere sham supposed. It was, and is, a legitimate Annuity Contract, the issuance of which in Texas subjects the Company to the status of a regulated life insurance company.[7] As such, it is mandatory that the annuity or insurance contract provide that the company will " * * * advance upon proper assignment of the policy and upon the sole security thereof at a specified rate of interest a sum equal to * * * the cash value of the policy."[8] A Texas insurance company is also required to invest in Texas securities 75% of the aggregate amount of the

4. Subparagraph (6) was added by Sec. 129, Revenue Act of 1942, c. 619, 56 Stat. 798:

"§ 24. Items not deductible.

"(a) *General rule.* In computing net income no deduction shall in any case be allowed in respect of—

    *    *    *    *    *

"(6) Any amount paid or accrued on indebtedness incurred or continued to purchase a single premium life insurance or endowment contract. * * *" 26 U.S.C.A. § 24.

5. It is but a slight variation of the procedure followed here to suppose that the individual first borrows from a bank the full amount of the single premium on a demand note; the proceeds are paid next day to the company for an annuity bond; the annuitant then applies for and receives a loan for the full amount of the premium assigning the bond as the sole security; the company uses the proceeds received the day before with which to make the loan advance to the annuitant who takes the proceeds of the Annuity Loan to repay the bank.

6. If that is decisive, then interest paid on a policy loan on the sole security of a traditional Texas life insurance policy, see note 8, infra, or interest paid by one owning property *subject* to a mortgage debt not assumed by the payor would not qualify. See, e. g., 4 Mertens, Law of Federal Income Taxation, § 26.-03.

7. Texas Insurance Code, Vernon's Ann. Texas Stat., Art. 3.01: "A life insurance company shall be deemed to be a corporation doing business under any charter involving [a] * * * contract * * * for the payment of * * * annuities."

8. Texas Insurance Code, Art. 3.44. Reference in Subsection 6 to three full

legal reserve [9] required to be maintained on Texas contracts. Under the Insurance Code "Texas securities" expressly includes " * * * loans made to policyholders on the sole security of the reserve values of their policies." [10] Stringent limitations are placed on the nature and amount of investments, yet loans made to policyholders on the sole security of the policy reserves are automatically permitted. [11]

Indeed, to show that these are accepted Texas insurance contracts, we are not left to mere inference from these laws and regulations. The record here shows as an uncontradicted exhibit [12] that these very Bonds have been expressly approved as to content as well as the fiscal treatment of policy reserves, cash loan, asset and liability values. Moreover, these contracts confer real and genuine bene-

years' premiums would not apply. For Subparagraph 11 provides: "Any foregoing provision, not applicable to single premium policies shall, to that extent, not be incorporated therein."

Subparagraph 6 also provides: " * * It shall also be stipulated in the policy that failure to repay any such advance, or to pay interest, shall not void the policy until the total indebtedness thereon to the company shall equal or exceed the cash value. No condition other than as herein provided shall be exacted as a prerequisite to any such advance."

See, also, Life Policy Form Manual adopted by Board of Insurance Commissioners of the State of Texas, November 16, 1944, Section I Required Provisions, Paragraph 7. Policy Loans.

C. " * * * Since a single premium policy has premiums paid for all years when it is issued, it must provide loan values for all years including the first.

D. "The loan clause must provide for proper assignment of the policy to the company.

E. "The policy must be the sole security for the loan.

H. "The policy may provide that the company may deduct from such loan value any existing indebtedness on the policy * * *.

K. "No condition other than as herein provided shall be exacted as a prerequisite to any such advance."

9. Texas Insurance Code, Art. 3.33, "Required Investment in Texas Securities."

10. Texas Insurance Code, Art. 3.34.

11. Art. 3.39, authorized investments: "A life insurance company * * * may invest in or loan upon the following securities, and none other, * * *:

* * * * *

"2. * * * It may also make loans upon the security of or purchase of its own policies. No loan on any policy shall exceed the reserve values thereof. No investment or loan, except policy loans, shall be made by any such insurance company, unless the same shall first have been authorized by the Board of Directors * * *."

12. Examination Report, State of Texas, Board of Insurance Commissioners, December 31, 1953:

"Policy Loans—$20,707,986.80

"The above asset is comprised of 54 loans made to policy-holders secured by the Company's annuity and life contracts. Forty-two of the loans, in the amount of $20,702,720.00, are on one year [single premium] payment, twenty and thirty year maturity annuity bonds. * * * The contracts are issued by the Company on the basis of allowing the applicant to secure a full loan against the first year cash value. When the loan is made the applicant signs an interest bearing note which is paid in advance.

* * * * *

Liabilities
"Aggregate Reserve for Life Policies and Contracts—$21,589,234.73.

* * * * *

"Other reserves:
"Annuities          $20,823,293.13

* * * * *

"Aggregate reserve for life policies and contracts          $21,589,234.73

* * * * *

"Of the $20,823,293.13 reserve for deferred annuity contracts, as shown in the foregoing schedule, $20,728,252.13 is the reserve established by the Company for 105 individual single premium annuity contracts deferred for 15, 20, or 30 years. * * * No differences were noted, and it appears that the Company's valuation of the reserve liability on these contracts was complete and accurate."

fits in excess of the amounts paid in by the Annuitant.[13]

When we make this same realistic approach to an understanding and application of the Code, it becomes clear as a matter of Congressional intent that from 1934 to 1954, Congress has purposefully distinguished deductibility of interest charges on single premium payments for annuity contracts from those incurred to purchase a single premium life insurance or endowment contract.

A brief tracing of the legislative transmutations will demonstrate this. Section 214(a) (2) of the Revenue Acts of 1924 and 1926 and Section 23(b) of the Revenue Act of 1928 are identical with Section 23(b) of the 1939 Code, note 1, supra. Section 215 of the Revenue Acts of 1924 and 1926 and Section 24 of the Revenue Act of 1928 are similar to Section 24 of the 1939 Code, except that which was added to it by the Revenue Act of 1942 now appearing as Section 24(a) (6), note 4, supra, and

which excludes "any amount paid or accrued on indebtedness incurred or continued to purchase a single premium life insurance or endowment contract."

However, a change was made in 1932. There, for the first and only time until 22 years later was any reference made to "indebtedness incurred or continued in connection with the purchasing or carrying of an annuity." And at that time it was introduced as a part of Section [14] 23(b).

But it was scarcely a part of the law until it was deleted by the Revenue Act of 1934. Its short life was due to the change in 1934 of Section 22(b) (2) concerning the taxability of annuity income.[15] In the meantime, in dealing with the problem of taxability of income and possible correlative deductions or disallowances, Congress recognized that this related to the three distinctive contracts for life insurance, endowment and annuity, one of which was momentarily singled out for special treatment on dis-

---

13. For a $100,000 single premium Bond, note 3, supra, and assuming the payment of the $100,000 policy note, the following table of the agreed computations shows for the same representative periods ending 10, 16 and 30 years, respectively, the gain (Col. 3) by the Annuitant in Net Cash Value (Col. 2) over the amount of annual Interest Paid (Col. 1) and, for illustrative purposes, on the exercise of one of the Bond options, the gain (Col. 5) over the amounts Paid In (Col. 1) if, at the end of each such period, the Net Cash Value (Col. 2) is used (Col. 4) to purchase amortized monthly installments with 3% compounded interest guaranteeing a total return as specified:

| At end of year | (1) Interest Paid In | (2) Net Cash Value | (3) Gain of (2) over (1) | (4) If (2) used to purchase amortized monthly installments with 3% compounded interest, total guaranteed return | (5) Gain of (4) over (1) |
|---|---|---|---|---|---|
| 10 yrs. | $27,500 | $ 28,000 | $ 500 | $ 34,624.80 | $ 7,124.50 |
| 16 yrs. | 44,000 | 48,500 | 4,500 | 59,976.00 | 15,976.00 |
| 30 yrs. | 82,500 | 109,700 | 27,200 | 135,655.20 | 53,155.20 |

---

14. As a deduction from gross income, it allowed:

"(b) Interest. All interest paid or accrued within the taxable year on indebtedness, *except* (1) on indebtedness incurred or continued to purchase or carry obligations or securities * * * the interest upon which is wholly exempt from * * * taxes * * * by this title, or (2) on indebtedness incurred or

continued in connection with the purchasing or carrying of an annuity."

15. See CCH Standard Tax Reporter, 1953 Edition, Paragraph 171.196: "Under the 1932 Act, interest on indebtedness incurred or continued to purchase or carry annuities was not deductible, the annuity income not having been taxable until the cost or other applicable basis

allowance of interest, but all three of which were purposefully lumped [16] together in 1934 for treatment of income taxability.

Thus it stood in 1934, and for each occasion when the Revenue Acts of 1936, 1938, and the Internal Revenue Code of 1939 was enacted. This continued right down to the enactment in 1942 of Section 24(a) (6) of the 1939 Code, note 4, supra. And when the 1942 change was made, Congress, which had ten and eight years previously shown an articulate appreciation for the distinction between the three types of contracts, this time mentioned but two—life insurance and endowments—and omitted reference to the one—annuities—previously, but briefly, covered.

That this is a fair reading of the legislative purpose gets persuasive support from the administrative handling of this problem. The Regulation [17] under Section 23(b) dealt solely with "single premium life insurance or endowment" contracts, and at least one ruling [18] in 1947 allowed as a deduction interest paid on a single premium annuity contract as did

the later one in 1952 issued to a fellow officer and business associate of Taxpayer concerning this identical Annuity Bond and Annuity Loan Note.[19] It was not until Revenue Ruling 54–94, 1954–1 Cum.Bull. 53, of March 1, 1954, that interest paid respecting single premium annuity contracts was disallowed. It was this precise ruling that was the stated basis for the disallowance in May 1954 of the deduction by Taxpayer of these interest payments for the year 1952.

The imprimatur of Congress was placed on this historical reading of Section 23(b) and 24(a) (6) by its action in enacting the 1954 Code. For Congress, 22 years after momentarily specifying annuity contracts, 20 years after annuity contracts were deleted, and 12 years after specifying but two types of contracts, now for the very first time put all three together with respect to deductibility of the carrying charges.[20] And the words carefully used as well as the contemporary expressions in House and Senate Reports [21] manifest that Con-

---

of the annuity contract was recovered. The 1934 Act contained new provisions as to the taxation of annuities. See Sec. 22(b) (2) at Par. 93. * * *."

See, also, Cum.Bull. XIII–2, July-December, Mim. 4205, p. 449, denominated "Important changes in the Internal Revenue laws made by the Revenue Act of 1934" which, with respect to treatment of amounts received under annuity contracts points out the difference between Sec. 22(b) (2) of the 1932 and the same section of the 1934 Revenue Act.

16. See, e.g., Sec. 22(b) (2) Revenue Acts of 1934, 1936, 1938.

17. See Regulation 118, approved September 23, 1953, applicable December 31, 1951, Sec. 39.24(a)–5 which continues the language of Regulation 111 effective October 26, 1943, Sec. 29.24–9.

18. See P–H Tax Service 1947, Par. 16,145.

19. Letter Ruling, August 1, 1952, given to R. C. Salley. On November 23, 1953, the Commissioner, presumably because of the receipt of numerous inquiries occasioned by wide publicity given to the Ruling of August 1, 1952, warned Salley

that "We have concurrently under consideration the matter of revoking the Ruling Letter of August 1, 1952." On June 29, 1954, the Commissioner, based upon Revenue Ruling 54–94; IRB 1954–11, revoked the August 1, 1952 Ruling effective as to Salley November 23, 1953, the date of the warning letter.

20. Sec. 23(b) of the 1939 Code was divided into Sections 163 and 265, 1954 Code. Section 24(a) (6) became Sec. 264(a) and (b): "(a) General rule.—No deduction shall be allowed for—* * * (2) any amount paid or accrued on indebtedness incurred or continued to purchase or carry a single premium life insurance endowment, or *annuity* contract. Paragraph (2) shall apply in respect of *annuity* contracts only as to contracts purchased after March 1, 1954." (emphasis supplied)

21. See H.R.Rep. No. 1337, XIA, 83d Cong. 2d Sess., 1954 U.S.Code Congressional Administrative News, p. 4056:
"Under existing law, no interest deduction is allowed in the case of indebtedness incurred, or continued, to purchase a single-premium life insurance or endowment contract. * * *

gress was aware that under the prior law interest for annuity contracts, as distinguished from life insurance and endowment contracts, was deductible, that the purpose of the 1954 Code was to change that law to disallow the deduction, and that such change should not be effective prior to March 1, 1954, which was the date of Revenue Ruling 54–94.

We emphasize that whether and to what extent interest deductions are to be permitted involves consideration of many complex, intricate, and sometimes technically significant factors which Congress, the weaver, evaluates as it weaves and unweaves the seamy web men call tax law. In that process Congress has purposefully distinguished between annuity contracts and the other two. In that light Section 23(b) and 24(a) (6) reflect a purpose to treat payments of the kind made here as interest and allow them as a deduction.

Affirmed.

WISDOM, Circuit Judge (dissenting).

With all due deference to my able associates, it seems to me that the majority opinion does not meet the issue squarely.

The case presents the question: Were the amounts the taxpayer paid the insurance company interest under Section 23(b)? This question is not answered by showing that Section 24(a) (6) does not prohibit deductions for amounts paid on indebtedness to purchase an annuity contract, as distinguished from a life insurance or endowment contract. Section 24(a) applies to specific items that are *not* deductible. It does not purport to say what items are deductible. As I see it, regardless of Section 24(a) (6), the taxpayer's payments must still qualify as interest under Section 23(b).

The issue is not met by showing that the contract was a legitimate annuity

and that the Sam Houston Company complied with the Texas Insurance Code. On the contrary, as a legitimate annuity, the payments produced the same insurance effects ordinary annual premiums produce. All premiums, of course, "confer real and genuine benefits in excess of the amounts paid." There is no pretense, however, that delivery of the note for $100,000 produced the effect of payment in cash of a single premium for that amount. The taxpayer's payments were no more than annual premiums, the purchase price of the contract on a deferred payment plan. And, interest is not purchase price.

It seems to me that this Court must say what interest is under Section 23(b) and why the taxpayer's payments come within or fall outside of the definition.

The Supreme Court has defined *interest* as "the amount which one has contracted to pay for the use of borrowed money". Old Colony Railroad Co. v. Commissioner, 1932, 284 U.S. 552, 52 S.Ct. 211, 214, 76 L.Ed. 484. It has the same meaning in the market place. "In the business world 'interest on indebtedness' means compensation for the use or forbearance of money". Deputy v. Dupont, 1940, 308 U.S. 488, 497, 60 S.Ct. 363, 368, 84 L.Ed. 416. That is the dictionary meaning of "interest". There is nothing to indicate that it has a different meaning on Capitol Hill.

The majority opinion quotes this language from the Supreme Court, but accents "indebtedness" and states that "the Government insists that this is not an indebtedness". True enough, the government argues that "there was no real indebtedness". The crux of the case for the government, however, is that, for purposes of tax deduction, interest is confined to payments made for the use of borrowed money. Here, since no money or other economic benefits were

"Existing law does not extend the denial of the interest deduction to indebtedness incurred to purchase single-premium annuity contracts. * * *

"Your Committee's bill will deny an interest deduction in such cases but

only as to annuities purchased after March 1, 1954. * * * *"

See Senate Report, id. pp. 4668, 4862, Conference Rep., H.R.Rep. No. 2543, 83d Cong., 2d Sess., id. p. 5292.

advanced to the taxpayer by the company, the payments were not interest.

Some legal terms should be as expansible and contractible as an accordian. But not the term "interest" in a taxing statute. Taxpayers and tax collectors should have the benefit of certainty of meaning; well, as much certainty as a clear definition by the Supreme Court carries.

I respectfully dissent.