**Robert M. DIGGS and Clara C. Diggs,
Petitioners,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

**No. 174, Docket 25872.**

United States Court of Appeals
Second Circuit.

Argued Dec. 4, 1959.

Decided July 5, 1960.

Robert M. Diggs, Clara C. Diggs, Olean, N. Y., pro se.

Howard A. Heffron, Acting Asst. Atty. Gen., Melva M. Graney, Lee A. Jackson, Harry Baum, Grant W. Wiprud, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before CLARK, WATERMAN and MOORE, Circuit Judges.

WATERMAN, Circuit Judge.

Petitioner Robert M. Diggs [1] seeks review of a decision of the Tax Court denying his claims for deduction under Section 23(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(b) for payments he made in 1952 and 1953 to the Standard Insurance Company of Indiana. These payments purported to be payments of interest upon a debt created when Standard loaned petitioner an amount necessary to prepay premiums on two annuity contracts Standard had issued to petitioner. The Tax Court's approval of the Commissioner's disallowance of petitioner's claimed interest deductions was based upon its decisions in W. Stuart Emmons, 1958, 31 T.C. 26 and Carl E. Weller, 1958, 31 T.C. 33, decisions affirmed by the Third Circuit in a single opinion, Weller v. C. I. R., 3 Cir., 1959, 270 F.2d 294. In Weller, 270 F.2d at page 299, the Third Circuit rejected the majority reasoning of the Fifth Circuit in the earlier case of United States v. Bond, 5 Cir., 1958, 258 F.2d 577, wherein arguments for deductibility similar to petitioner's contentions here were sustained by a divided court. More recently, in

---

1. Petitioner Clara C. Diggs is a party to this litigation solely because, having married petitioner Robert M. Diggs on Feb-ruary 19, 1952, the tax returns for the years in controversy, 1952 and 1953, were joint returns.

Knetsch v. United States, 9 Cir., 1959, 272 F.2d 200, certiorari granted 1960, 361 U.S. 958, 80 S.Ct. 589, 4 L.Ed.2d 541 the Ninth Circuit followed the Third Circuit in Weller, and expressly rejected the Fifth Circuit's position in Bond. We agree with the results reached by our colleagues of the Third and Ninth Circuits.

The Tax Court's findings of fact in the present case have not been challenged and are detailed below. Petitioner, at some time immediately prior to December 12, 1951, purchased two 41-year deferred annuity contracts. Each contract called for a $5,000 annual premium, and each entitled the annuitant to monthly payments of $3,113.18 commencing on December 12, 1992. Petitioner paid the initial premiums. Then, on December 24, 1951, he borrowed from the Girard Trust Corn Exchange Bank of Philadelphia a sum of $236,856.72, representing a discounted prepayment of the remaining premiums which would otherwise have been payable $10,000 a year for 40 years, on the two contracts, which contracts were used as security for the loan. The bank then credited the loan proceeds to the account of Standard. As a result of the payment of the initial premiums and of this 40-year prepayment of premiums the total present cash value of the two contracts became $244,606. Two days later, on December 26, 1951, at petitioner's request, Standard sent the bank two checks of Standard equal to the amount of the bank loan and in full payment thereof. Also, at petitioner's request, and pursuant to an option in the contract permitting the annuitant to borrow up to the cash value of the contract, Standard issued to petitioner its checks totaling $7,749.28, thereby increasing Standard's loan to petitioner from the $236,856.72 Standard paid the bank to the full cash value of the contract, $244,606. This loan, pursuant to the terms of the annuity contract, was to be without recourse, the contracts themselves constituting the sole security, and was to require an annual interest charge of four per cent. On the same day, December 26, 1951, petitioner paid Standard $9,596.08 as a prepayment of this 4% interest on the $244,606 loan for one year, or until December 12, 1952.[2] In December 1952, petitioner paid Standard $9,784.24 as prepayment of interest for the year, or until December 12, 1953. On September 1, 1953, the present cash value of the contracts having increased, petitioner notified Standard of his intention to increase his loan up to the increased cash value as of December 12, 1953, or $253,464; and he enclosed a check for $88.60 as prepayment of interest on the increase of the face of the loan, $8,858, for the period from September 1, 1953 to the premium payment date of December 12, 1953. Standard complied with the request, and sent petitioner checks totaling $8,858. On December 9, 1953 petitioner paid Standard $32,814.48, an amount representing a three-year prepayment of interest for the period December 12, 1953–December 12, 1956, upon a loan equal to the cash value the contracts would have on December 12, 1956. Thereupon Standard sent petitioner checks totaling $19,990, thus increasing petitioner's loan from $253,464, the cash value of the contracts on December 12, 1953, to $273,454, the cash value they would have on December 12, 1956. Similarly, on December 10, 1956, petitioner sent Standard checks totaling $11,204.64,[3] a prepayment of interest upon a loan equal to the cash value, $280,117, the contracts would have as of December 12, 1957. Standard again complied, and, accordingly, sent petitioner checks totaling $6,663 representing this cash value increase. On or about December 12, 1957 the cash value of the contracts was set off

---

2. This amount, together with $182.20 petitioner paid to the bank, was deducted by the taxpayer on his 1951 return and was allowed by the Commissioner as an interest deduction under Section 23(b). It is not here in issue.

3. The 1956 prepayment of interest is not here in issue. It is unclear whether petitioner claimed a deduction for this prepayment on his return for that year.

against the principal amount of the loan, the contracts were canceled, and Standard and petitioner each went their separate ways. Three tables setting forth petitioner's transactions with Standard in the five-year period between December 1951 and the end of December 1956 appear in a footnote.[4] The amounts in-

4.   I. *Petitioner's Payments to Standard.*

| Payment Date | Amount | Nature of Payment |
|---|---|---|
| On or before Dec. 26, 1951 | $10,000 | Initial annual premium |
| Dec. 26, 1951 | 9,596.08 | Prepayment of interest on loan for period Dec. 19, 1951 to Dec. 12, 1952 |
| Dec. 1952 | 9,784.24 | Prepayment of interest on loan for period Dec. 12, 1952 to Dec. 12, 1953 |
| Sept. 1, 1953 | 88.60 | Prepayment of interest on loan for period Sept. 1, 1953 to Dec. 12, 1953 |
| Dec. 9, 1953 | 32,814.48 | Prepayment of interest on loan for period Dec. 12, 1953 to Dec. 12, 1956 |
| Dec. 10, 1956 | 11,204.64 | Prepayment of interest on loan for period Dec. 12, 1956 to Dec. 12, 1957 |

II. *Standard's Payments to Petitioner (in form of increases in Standard's loan to Petitioner).*

| Payment Date | Amount | Date on which cash value of contracts equal to loan |
|---|---|---|
| December 26, 1951 | $ 7,749.28 | December 24, 1951 |
| September 10, 1953 | 8,858.00 | December 12, 1953 |
| December 11, 1953 | 19,990.00 | December 12, 1956 |
| December 12, 1956 | 6,663.00 | December 12, 1957 |

III. *Petitioner's Claimed Deductions Expressed as a Percentage of his Out-of-Pocket Costs.**

| (a) Taxable Year Ending | (b) Claimed Deduction ** | (c) Out-of-Pocket Cost * | (d) (b) as Percentage of (c) |
|---|---|---|---|
| Dec. 31, 1951 | $ 9,596.08 | $11,846.80 | 81% |
| Dec. 31, 1952 | 9,784.24 | 9,784.24 | 100 |
| Dec. 31, 1953 | 32,903.08 | 4,055.08 | 802 |
| Dec. 31, 1956 | 11,204.64** | 4,541.64 | 248 |
| Summary over two-year period, 1951–1953 | 52,283.40 | 25,686.12 | 204 |
| Summary over five-year period, 1951–1956 | 63,488.04** | 30,227.76 | 210 |

    * "Out-of-pocket cost" is here defined as the total payments to Standard minus the total payments by Standard in the form of additional loans to petitioner.

  ** But see note 3, *supra.*

volved in the present controversy are the $9,784.24 petitioner paid Standard in 1952, and the $32,903.28 he paid Standard in 1953 by his checks of September 1 and December 9 of that year. These sums were deducted by taxpayer as "in-

terest paid" on his returns for those years. The Commissioner disallowed the deductions.

These transactions have been recited here, with perhaps wearying detail, in order to clearly set forth the overall arrangement petitioner entered into with Standard in order to obtain deductions from gross income for the purported payment of interest, thereby to reduce his net income and his tax liability. A strong argument based upon Sections 23 (b) and 24(a) (6) of the 1939 Code, 26 U.S.C.A. § 24(a)(6) and supported by Section 264(a) (2) of the 1954 Code, 26 U.S.C.A. § 264(a) (2) can be advanced for the proposition that interest paid on loans used to purchase single-premium annuity contracts is deductible from gross income as "interest paid on indebtedness" if the annuity contracts were purchased prior to March 2, 1954. See majority opinion in United States v. Bond, 5 Cir., 1958, 258 F.2d 577, 582–584.

Petitioner concedes that one purpose, the primary purpose, of his transactions with Standard was to reduce his income taxes, but he also earnestly contends that these transactions had purposes in addition to the conceded objective. Petitioner has prepared a table demonstrating that if he had confined his "borrowing" to the initial $7,749.28 he borrowed on December 26, 1951 he would have realized a profit of $56,640.16 when the contracts became payable at the end of the forty-first year. But even if this argument is to be taken seriously in view of the length of time involved,[5] the short answer to it is that petitioner in fact did not so limit his borrowing. The effect of his borrowing in 1953 was to reduce this prospective profit to $12,791.20. And his additional borrowing in 1956 reduced an already somewhat ethereal profit down to a meagre $3,463 to be enjoyed thirty-six years hence. Petitioner

labors hard to persuade us that there is economic substance, or business purpose, here, but we can discern in the overall transaction no possible motive other than one of tax avoidance and no graspable realistic financial benefit other than that.

As indicated in the first paragraph of this opinion, the Tax Court's decision below was based upon its prior decisions in W. Stuart Emmons and Carl E. Weller. These decisions rest upon Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596. While Gregory has been most frequently applied in cases where the parties have dealt at less than arm's length, as a general principle for construing revenue statutes, see Fairfield S. S. Corp. v. C I. R., 2 Cir, 1946, 157 F.2d 321, 323, certiorari denied 329 U.S. 774, 67 S.Ct. 193, 91 L.Ed. 665, we see no obstacle to applying it in the present case. Cf. Lynch v. C. I. R., 2 Cir., 1959, 273 F. 2d 867, 870–871. Precise formulation of the Gregory principle has proved somewhat difficult. There is language in some of our opinions, see Kocin v. United States, 2 Cir., 1951, 187 F.2d 707; Slifka v. C. I. R., 2 Cir., 1950, 182 F.2d 345; C. I. R. v. Transport Trading & Terminal Corp., 2 Cir., 1949, 176 F.2d 570, 572, certiorari denied 338 U.S. 955, 70 S.Ct. 493, 94 L.Ed. 589, rehearing denied 339 U.S. 916, 70 S.Ct. 566, 94 L.Ed. 1341, suggesting that Gregory v. Helvering applies to preclude tax relief as to any transaction the taxpayer entered into solely for the purpose of avoiding taxes. Such an application of the holding in that case would be, however, a mistaken oversimplification. The opinion in Gregory v. Helvering permits proper tax avoidance. There it is stated, supra at page 469 of 293 U.S., at page 267 of 55 S.Ct., "[T]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." And as Judge Hand has pointed out

---

5. The Government further points out that, even conceding petitioner's assumption of no further borrowing, it would not be until the nineteenth year of the transaction that the annual increase in cash value would exceed the annual interest charge, and it would not be until the thirty-fifth year that surrender values would exceed the total cost.

in his dissent in Gilbert v. C. I. R., 2 Cir., 1957, 248 F.2d 399, 410, 411, as to many transactions Congress has clearly intended tax relief irrespective of the parties' motives. After surveying our more recent cases the majority stated in Gilbert, supra, at pages 403–406, that the principle of Gregory v. Helvering would operate to deny tax relief whenever a transaction was without economic substance or whenever the taxpayer's characterization of the transaction was economically unrealistic. We concluded, supra, 248 F.2d at page 406, "[I]n either case the taxpayer must show that his treatment of the transaction does not conflict with the meaning the Congress had in mind when it formulated the section *sub judice.*" Consistent with the principle we thus set forth in Gilbert, we are of the belief that at the least Gregory v. Helvering requires that a taxpayer carry an unusually heavy burden when he attempts to demonstrate that Congress intended to give favorable tax treatment to the kind of transaction that would never occur absent the motive of tax avoidance. Here it is obvious that petitioner has failed to sustain such a burden.

We have examined petitioner's other contentions which relate to the tax incidents of his payments to Standard; and also his contentions relative to alleged casualty losses. We have found all these contentions to be without merit.

The decision of the Tax Court is affirmed.

MOORE, Circuit Judge (dissenting).

My difficulty with the decision is that the Commissioner and the Tax Court add together a series of perfectly legal acts and come out with illegality as their sum. To me this is not only bad mathematics but unsound legal reasoning. They arrive at this result because they do not regard the purchase of the annuities as a commercially meaningful transaction; to them it was merely a tax scheme. At the same time, they concede that where interest is paid on true annuity indebtedness, the interest is deductible. Despite the fact that the transaction had been carefully planned under the law to take advantage of permissible deductions, governmental taxing authorities by calling it a "scheme" (a word of evil connotation) assume a paternalistic role to decide whether a taxpayer should, in his particular circumstances, have handled his financial affairs as he did. Such a paternal attitude comes dangerously close to that envisioned (facetiously, I hope) in "1984" (George Orwell)—a date at the time of writing undoubtedly imaginative but now rapidly approaching.

Review for a moment the position of this taxpayer in 1951. The Standard Life Insurance Company of Indiana offered to sell to the public annuity contracts. The company was legal; the annuity contract was legal. Interest deductions were legal and Congress by its actions in 1932 and 1934 had shown a definite awareness of the annuity indebtedness interest problem by excluding single premium life insurance or endowment contracts but repealing the brief two-year exception as to annuity contracts (see the review of legislative history, United States v. Bond, 5 Cir., 1958, 258 F.2d 577, 582–584). The taxpayer bought two annuities. Payment of a single premium was legal. The Insurance Company could legally loan up to the cash value of the annuities. Thus, when the loans were made, all steps were legal, actual annuity contracts had been issued, real indebtedness obligations secured by the contracts recorded on the insurance company's books and interest thereon was payable by the taxpayer. How then do the Commissioner and the Tax Court inject lack of reality into a situation which thus far was very real. They find that the taxpayer borrowed the full cash value to pay the premiums. But such a borrowing was legal. If this practice was not wise it was a subject for the various states to consider in revising their insurance laws. They next point to pre-payments of interest for three years at a time when the taxpayer was desirous of offsetting deductions against large capital gains which he had taken. But again this practice is permitted by law

Lastly, they comment on the taxpayer's additional borrowing up to the cash value —a procedure as legal as the original loan.

Of course, it is most obvious that the insurance company in selling, and the taxpayer in buying under the plan for borrowing to pay the premiums, were mindful of the tax advantages resulting from interest deductions. Assume that they had this motive. Tax saving as a motive does not change a "plan" into a "scheme" to fraudulently deprive the government of taxes otherwise due. The Commissioner argues that the interest for 19 years would exceed the contract increment. If wisdom of business judgment is to be the test, then the Commissioner will have to examine into interest paid at 6% on a loan to buy securities paying only 1% or 2% or in many cases nothing at all. Or should interest be disallowed on a large mortgage when the homeowner is shown to have adequate assets to own his home mortgage free. Therefore, to impose on a taxpayer, as does the majority, the burden of showing that the transaction would have occurred "absent the motive of tax avoidance" imputes to Congress an intent which Congress has not yet disclosed.

Congress, however, has in this case disclosed a clear intent that interest on annuity indebtedness now is not to be excepted because in finally reversing its policy of 1934 in 1954, it enacted Section 264 of the Internal Revenue Code of 1954, providing:

"(a) General rule.—No deduction shall be allowed for—

\* \* \* \* \* \*

"Any amount paid or accrued on indebtedness incurred or continued to purchase or carry a single premium life insurance, endowment, or annuity contract. Paragraph (2) shall apply in respect of annuity contracts only as to contracts purchased after March 1, 1954."

Using only the plain meaning of the words as a guide, the prohibition does not apply to contracts purchased before March 1, 1954, as here. The Commissioner is forced to avoid this obvious conclusion by arguing that even though annuity indebtedness interest was deductible, the transaction lacked reality. At this stage, the argument is back to the point of beginning. The Commissioner is not construing the law but rather imposing his views as to the method of handling the annuity purchase.

I recognize that in Weller v. C. I. R., 3 Cir., 1959, 270 F.2d 294, the Commissioner prevailed on a similar policy, the court rejecting the decision of the Fifth Circuit in United States v. Bond, 5 Cir., 1958, 258 F.2d 577. The Ninth Circuit has recently affirmed the Commissioner's position in Knetsch v. United States, 9 Cir., 1959, 272 F.2d 200, certiorari granted 1960, 361 U.S. 958, 80 S.Ct. 589, 4 L.Ed.2d 541. The rationale of these decisions appears to be based upon the assumption in the dissenting opinion of Judge Wisdom in the Bond case that "since no money or other economic benefits were advanced to the taxpayer by the company, the payments were not interest." (258 F.2d 577, 584–585.)[1]

But in our present-day commercial system, money is not "advanced" in the sense of delivery. A bank will buy securities for a customer and make a loan against the securities as collateral. The customer usually never sees money or securities. The margin account taxpayer does not take his interest each month and hand it to his broker. His account is debited; his loan thus increased. Here Standard was no different than a lending bank. Its books were subject to audit undoubtedly by one or more governmental agencies. Its premium account

---

1. I am not unmindful of such cases as Gilbert v. C. I. R., 2 Cir., 1957, 248 F. 2d 399; Goodstein v. C. I. R., 1 Cir., 1959, 267 F.2d 127; Sonnabend v. C. I. R., 1 Cir., 1959, 267 F.2d 319; Lynch v. C. I. R., 2 Cir., 1959, 273 F.2d 867; and Becker v. C. I. R., 2 Cir., 1960, 277 F. 2d 146, but the factual differences in these cases are such as to eliminate them from having persuasive or precedent force here.

was credited when the payment was made just as if the taxpayer had borrowed from a neighboring bank and handed the money through a cashier's window. Under such circumstances the interest would have been deductible. Surely application of the tax laws does not depend upon the source of the borrowing. Here the taxpayer and the Insurance Company were not taking advantage of a statutory loophole. "Loophole" connotes an inadvertent omission or oversight. Congressional action clearly indicates that between 1934 and 1954 interest on annuity indebtedness was intentionally not excluded. Taxpayers should be able to rely on the law. Because the law as to estoppel is apparently well settled in Automobile Club of Michigan v. Commissioner, 1957, 353 U.S. 180, 77 S.Ct. 707, 1 L. Ed.2d 746 and in Helvering v. New York Trust Co., 1934, 292 U.S. 455, 54 S.Ct. 806, 78 L.Ed. 1361, I cannot add that upon such non-legal grounds as ordinary fair play they should also be able to place reliance upon the Treasury Department's statements and rulings.

I would reverse as to the interest payments.