**Rufus C. SALLEY and Beulah S. Salley,
Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 71-3122**

**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

July 24, 1972.

J. L. Rothchild, Houston, Tex., for petitioners-appellants.

---

\*     Rule 18, 5 Cir.; *see* Isbell Enterprises, Inc. v. Citizens Casualty Co. of     New York, 5 Cir. 1970, 431 F.2d 409, Part I.

Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, K. Martin Worthy, Chief Counsel, Eugene F. Colella, I.R.S., Washington, D. C., for respondent-appellee.

Before JOHN R. BROWN, Chief Judge, and GOLDBERG and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

Taxpayers, Rufus C. Salley and Beulah S. Salley, in search of the ever-elusive grail of the "tax loophole," appeal from a determination by the Tax Court that so-called interest payments on loans from their controlled insurance company are not deductible under 26 U.S.C.A. §§ 163 (a), 162(a), or 212(1).[1] 55 T.C. 896 (1971). We agree with the Tax Court that the alleged loans are without economic substance and do not create a genuine indebtedness between taxpayers and their insurance company that would justify any deductions for so-called interest.

Taxpayers, husband and wife, were officers and directors of Sam Houston Life Insurance Company (Sam Houston) and Houston National Life Insurance Company (Houston National), both operating out of Houston, Texas. Rufus Salley was the president, treasurer, director, and principal shareholder of Houston National, and the president, treasurer, director, and one of the principal shareholders of Sam Houston. Beulah Salley was an officer and director of Houston National, and a director of Sam Houston. In December of 1957, both taxpayers took out separate insurance policies with their controlled company, Houston National. Both policies provided for $20,000 coverage with annual premiums of a little over $26,000.[2] Taxpayers allege that they purchased the policies solely in order to permit Houston National to comply with a new Texas statute which required an insurance company licensed by Texas either (a) to maintain not less than 100 policy holders nor less than $200,000 of insurance,[3] or (b) to maintain a gross premium income of greater than $50,000 during its last preceding accounting year.[4] Although the statute be-

---

[1] "(a) General rule.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."
26 U.S.C.A. § 163(a).
    "(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—
(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;
(2) traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity."
26 U.S.C.A. § 162(a).
    "In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

[1] for the production or collection of income; . . ."
26 U.S.C.A. § 212(1).

[2] The premium for Rufus, then 63 years of age, was $26,389.40 per year, while the annual premium for Beulah, then age 57, was $26,028.20. It is clear from a comparison of the face amount of the insurance with the annual premiums that the Salleys paid most of their yearly premiums in exchange for the guaranteed annual return.

[3] The $200,000 requirement could be met by insurance written by the company or by insurance acquired through reinsurance contracts.

[4] "Section 1. Every domestic insurance company, corporation, mutual life insurance company, statewide mutual assessment company, mutual insurance company other than life operating under and governed by the provisions of Chapter 15 of the Insurance Code, Lloyds, reciprocal or interinsurance exchange, title insurance company, or other insurer which is by law required to be licensed by the Board of Insurance Commissioners of the State of Texas, shall maintain in force at all times not less than one hundred (100) Policy Hold-

came effective in 1955, it did not become applicable to Houston National until 1956. During 1956 Houston National maintained a sufficient number of policy-holders and total insurance to meet the requirements of the statute. But during 1957, Houston National experienced a substantial and unexplained decline in both policies and total insurance value, which coincided with a corresponding increase in both policies and total insurance held by Sam Houston. As a result of the 1957 decline, Houston National came within the requirements of the Texas Insurance Code only after taxpayers purchased their two policies in 1957, thereby increasing Houston National's gross premium income to more than $50,000 for that year.

Almost exactly six years later taxpayers requested that Houston National convert their original 1957 policies to another policy form that had just been authorized by the Texas Insurance Commissioner. Houston National complied, and the new policies were issued in December of 1963. The converted policies carried on their faces the original execution date of December, 1957, and provided for the same amount of insurance and the same premiums as the 1957 policies. Both the 1963 and the 1957 policies provided for a "guaranteed annual return" of $25,000. None of the guaranteed annual income provisions is keyed to a mortality table, unlike most provisions in life insurance contracts. Nor do the guaranteed annual return provisions involve any of the normal life insurance risks.

When taxpayers paid their annual premiums they could elect to allow the guaranteed annual return to accumulate, to receive the return in cash immediately, or to apply the return to the payment of premiums. However, the 1963 conversions differed in some significant respects from their 1957 antecedents. First, the 1963 converted policies provided for profit-sharing, which the 1957 policies did not. Second, the converted policies allowed an interest rate on cash loans of not more than 5%, whereas the earlier policies allowed only 4% interest. Third, the newer policies employed 1958 mortality tables that provided for a 3½% interest factor as the basis for reserves and policy values, while the 1957 policies utilized 1941 mortality tables with an interest factor of 4%. Finally, the new policies did not require Houston National to pay any interest whatsoever on any accrued accumulations of taxpayers' guaranteed annual returns, while accumulations under the 1957 policies earned a 3% return.

Taxpayers paid all premiums as due from 1957 through 1966 and elected throughout to allow the guaranteed annual returns to accumulate at 3% interest until 1963, and at no interest thereafter. Taxpayers then proceeded to "borrow" certain sums every year from Houston National.[5] The Tax Court found that these so-called loans were drawn annually upon the $25,000 guaranteed annual return in each policy. In some cases taxpayers also borrowed sums based upon the cash values per $1,000 face amount

---

ers or Certificate Holders nor less than Two Hundred Thousand Dollars ($200,000) of insurance which has been written by said insurer or which has been acquired through reinsurance contracts; provided, however, that the provisions of this Act shall not apply to any such insurer which has had paid to it by Policy Holders gross premium income in excess of Fifty Thousand Dollars ($50,000) during its last preceding accounting year, or until two (2) years after its original certificate of authority has been issued; and further provided that the provisions of this Act shall not take effect as to any insurer which

has heretofore been issued an original certificate of authority until one (1) year after the effective date of this Act."
Texas Insurance Code, Art. 21.45, V.A.T.S.

5. The terms "borrow," "loan," and "interest" are used only for the sake of convenience in our discussion of this case. It is the Government's contention here that the transactions in question did not create any true indebtedness between Houston National and the taxpayers, and, therefore, did not create any "loan" or any "interest."

of insurance on the policies. Taxpayers signed new notes annually to cover the increasing amounts of the purported loans. Each note provided for an interest rate of 4%, which taxpayers prepaid for each succeeding year. The notes specifically stated that taxpayers were not personally liable for payment of either principal or interest. As a result of these loans and payments, taxpayers made so-called interest payments of $54,000 from 1964 through 1966, the tax years in question here, while receiving from Houston National some $47,-580.93 in the form of non-taxable insurance dividends. The Commissioner disallowed the purported interest deductions taken on the so-called loans in taxpayers' joint returns for 1964 through 1966. The Tax Court sustained the Commissioner's determination with regard to the alleged interest payments for loans drawn on the guaranteed annual returns, but overruled his determination with regard to loans drawn on the cash values of the policies. The Government does not appeal that part of the decision adverse to it. Taxpayers, however, do appeal, alleging basically that the Tax Court erred in concluding that the transactions involved here were without economic substance or business purpose, and, therefore, not deductible as interest under Section 163(a), as business expense under Section 162(a), or as expenses paid for the production of income under Section 212(1), *supra* note 1. Finding the judgment of the Tax Court correct, we affirm.

The net result of taxpayers' well-choreographed ballet is that both taxpayers paid about $7,000 out-of-pocket for three years, while at the same time acquiring interest deductions of more than $50,000, which in taxpayers' bracket amounted to a tax windfall of some $20,000.[6] Knetsch v. United States, 1960, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128, made an effort to ring down the tax curtain on so-called

interest deductions that derived from transactions without "commercial economic substance." In *Knetsch* the taxpayer purchased 30-year deferred annuity savings bonds from an insurance company at 2½% interest compounded annually. During the two tax years in question, taxpayer paid $294,570 to the insurance company and then "borrowed" back $203,000 at 3½% interest, secured only by the annuity bonds. For the $91,570 difference, taxpayer received an annuity contract that would produce monthly annuity payments of over $90,-000 when taxpayer reached the age of 90 or substantial life insurance proceeds in the event of taxpayer's death before maturity of the bonds. The Supreme Court concluded that taxpayer's annuity bond contract

". . . was a fiction, because each year Knetsch's annual borrowings kept the net cash value, on which any annuity or insurance payments would depend, at the relative pittance of $1,000. . . . [I]t is patent that there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction. What he was ostensibly 'lent' back was in reality only the rebate of a substantial part of the so-called 'interest' payments. The $91,570 difference retained by the company was its fee for providing the facade of 'loans' whereby the petitioners sought to reduce their 1953 and 1954 taxes. . . ."

Knetsch v. United States, 364 U.S. at 366, 81 S.Ct. at 135, 5 L.Ed.2d at 132.

The real inquiry in this appeal is whether or not the loan transaction in question demonstrates sufficient economic substance, "business purpose," or "purposive activity" to come within the scope of the interest deduction allowed under Section 163(a)-*cum-Knetsch*. See Campbell v. Cen-Tex, Inc., 5 Cir. 1967, 377 F.2d 688; Knetsch v. United States, *supra; see also* Goldstein v. Commission-

---

6. Taxpayers are practically virtuosos at what might be called the taxpayer shuffle. *See* United States v. Salley, 5 Cir. 1961, 290 F.2d 708, on remand, Salley v.

United States, S.D., Tex.1965, 239 F. Supp. 161; Salley v. Commissioner of Internal Revenue, 5 Cir. 1963, 319 F.2d 847.

er of Internal Revenue, 2 Cir. 1966, 364 F.2d 734, cert. denied, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543; Golsen v. Commissioner of Internal Revenue, 10 Cir. 1971, 445 F.2d 985; Goldman v. United States, 10 Cir. 1968, 403 F.2d 776. As the Tax Court correctly points out, if any so-called interest payments are not deductible as "interest" under Section 163(a) because the loan transaction here is without economic substance, then that lack of economic substance would also prohibit deductibility of the so-called interest as a business expense, Section 162(a), or as an expense paid for the production of income, Section 212(1). *See* Walton O. Hewett, 47 T.C. 483 (1967); Rufus C. Salley, 55 T.C. 896 (1971).[7]

Of the many cases that have construed *Knetsch*, the most critical to this appeal is this Court's decision in Campbell v.

---

7. In addition, only Houston National, not the taxpayers as individuals, could claim a business expense deduction under Section 162(a), *supra* note 1, because only Houston National was a "trade or business" directly benefitted by compliance with Article 21.45 of the Texas Insurance Code, *supra* note 4, whether or not taxpayers themselves purchased the two policies that put Houston National in compliance with the law. *See* Deputy v. Du Pont, 1939, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416. For the same reason, taxpayers cannot claim a deduction under Section 212(1), for Section 212 " . . . is comparable and in pari-materia with [Section 162]." Trust of Bingham v. Commissioner of Internal Revenue, 1944, 325 U.S. 365, 373, 65 S.Ct. 1232, 1237, 89 L.Ed. 1670, 1676, Section 212 simply enlarges " . . . the category of incomes with reference to which expenses were deductible," McDonald v. Commissioner of Internal Revenue, 1944, 323 U.S. 57, 62, 65 S.Ct. 96, 98, 89 L.Ed. 68, 73, providing for a class of deductions " . . . coextensive with the business deductions allowed by [Section 162]," but without " . . . the requirement that the income-producing activity qualify as a trade or business." United States v. Gilmore, 1963, 372 U.S. 39, 45, 83 S.Ct. 623, 627, 9 L.Ed.2d 570, 575. The net effect of Section 212 is simply to relieve the narrow construction given to the "trade or business" requirement of Section 162 by Higgins v. Commissioner, 1941, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783, not to allow a business expense deduction for expenditures that are made for the business benefit of someone other than the taxpayer. *See* United States v. Gilmore, *supra.*

"As with 'business' expenses, deductible under section 162, 'non-business' expenses [under Section 212] are deductible only if they represent an expense *of the taxpayer himself.*"

Walton O. Hewett, 47 T.C. at 488 [emphasis added]. Taxpayers' purchase of insurance policies for the purpose of "legitimizing" Houston National would not constitute "ordinary and necessary expenses . . . for the production or collection of income" for the benefit of the taxpayers within the scope of Section 212 (1):

"The expenditure was not directly or immediately related to the production of [appellants]' income. It was more directly related to the production of the corporation's income."

Walton O. Hewett, 47 T.C. at 488. The Government also urged below, and the Tax Court agreed, that only Houston National could claim a Section 163(a) interest deduction under taxpayers' theory of economic substance, since only Houston National derived direct economic benefit from compliance with Article 21.45 of the Texas Insurance Code. We think that this conclusion is incorrect, for it confuses taxpayers' purpose in purchasing the insurance policies in 1957 with taxpayers' purpose in borrowing annually on the guaranteed annual return. It is the latter purpose that is in issue in this case. While it is true that only Houston National, not the taxpayers as individuals, was forced by Texas law to acquire certain minimum insurance assets, we cannot conclude that taxpayers derived no economic benefit from the purchase of the insurance policies in 1957, when it was, arguably, their two insurance purchases that sustained Houston National's existence as an ongoing insurance concern. As principal stockholders, officers, and directors, taxpayers were entitled to a legitimate business concern that Houston National continue to do business in Texas. As we have already pointed out, that business concern would not entitle taxpayers as individuals to deduct the costs of the policies as business expenses under Section 162(a) or as expenses paid for the production of income under Section 212 (1). *See* Deputy v. Du Pont, *supra*; Walton O. Hewett, *supra; see also* Kornhauser v. United States, 1927, 276

Cen-Tex, *supra*. In *Cen-Tex* a corporate taxpayer purchased life insurance on the lives of its insurable shareholders, who were all members of the same family. The purpose of those purchases was to enable the corporation to meet certain contractual obligations that it had assumed, specifically a deferred compensation plan and an obligation to purchase the stock of deceased shareholders. The corporation paid the first annual premium on each policy, prepaid the next four annual premiums at a 3% discount, and then borrowed each policy's loan value at 4% interest. The loan value had been substantially increased by the prepayment of the premiums. This Court concluded that the transactions in *Cen-Tex* demonstrated economic substance in that the prepayment of the premiums allowed "additional death benefits and larger loan values" to the policies. Campbell v. Cen-Tex, 377 F.2d at 689.

We conclude, as did the Tax Court, that the facts of the Salleys' transactions make *Cen-Tex* inapposite. There was simply no economic substance to taxpayers' perennial "borrowing" of their guaranteed annual returns. It is undisputed that the taxpayers could have claimed their guaranteed annual returns of $25,000 in cash immediately upon payment of their annual premiums. By "borrowing" the amount of the returns instead, taxpayers received substantial "interest" deductions, while at the same time allowing their annual returns and their annual loans to accumulate to sizeable sums on Houston National's books. By their annual premium payments of

---

U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505 [business expense under Section 214 of the Revenue Act of 1918 (chap. 18, 40 Stat. at L. 1057)]; Burnet v. Clark, 1932, 287 U.S. 410, 53 S.Ct. 207, 77 L.Ed. 397 [business loss under Section 204 of the Revenue Act of 1921 (chap. 136, 42 Stat. at L. 227)]; United States v. Fewell, 5 Cir. 1958, 255 F.2d 496 [distribution of taxable dividends under Section 115(g) (1) of the Internal Revenue Code of 1939]. But each of the above cases analyzes only certain sections of the tax laws which relate to so-called "business" expense deductions, such as Sections 162 and 212 of the 1954 Code, and not to the interest deductions of Section 163. As a general proposition, one might borrow money in order to benefit a corporation or another person, and interest payments could still be deductible by the borrower. *Cf.* Guardian Investment Corp. v. Phinney, 5 Cir. 1958, 253 F.2d 326; Sharon Herald Co. v. Granger, 3 Cir. 1952, 195 F.2d 890; *and see* Deputy v. Du Pont, *supra*, where the Supreme Court discusses the business expense deductions of the predecessor of Section 162 (Section 23(a) of the Revenue Act of 1928, chap. 852, 45 Stat. at L. 791) and the interest deduction of the predecessor of Section 163 (Section 23(b) of the Revenue Act of 1928) separately, and applies the Government's proposed "benefit" test only to deductions attempted under the business expense section, Section 162. The test for deductibility of interest under Section 163(a) is whether or not the alleged indebtedness is a sham, Knetsch v. United States, *supra*; Lynch v. Commissioner of Internal Revenue, 2 Cir. 1959, 273 F.2d 867; Goodstein v. Commissioner of Internal Revenue, 1 Cir. 1959, 267 F.2d 127, or whether or not the transaction was entered into "solely in order to obtain a deduction," Goldstein v. Commissioner, 364 F.2d at 742; Knetsch v. United States, *supra*. That inquiry has nothing to do with the question of who might actually receive the direct business benefit of the borrowed funds, in the sense that direct business benefit has been construed under the business expense sections of the Code.

Of course, even if the taxpayers in the instant case demonstrate economic substance to their purchases of insurance policies from Houston National in 1957, that demonstration does not establish a similar business purpose for the years following 1957. More important, evidence of a business purpose in the 1957 purchase of the policies does not concomitantly establish any economic substance to the taxpayers' annual borrowings of the guaranteed annual returns. As we have indicated, the Texas statute was satisfied by the payment of the premiums, not by the subsequent borrowings. In addition, if taxpayers needed cash to pay their premiums, they could simply withdraw the returns, rather than borrow them. The annual borrowings of the guaranteed annual returns, as distinguished from the original purchases of the insurance policies in 1957, were clearly without economic substance or business purpose within the intent of Section 163(a) and Knetsch v. United States, *supra*.

about $26,000 per policy and their annual "loans" of about $25,000 per policy, primarily on the basis of their guaranteed annual returns, taxpayers here, as the taxpayers in *Knetsch*, ". . . kept the net cash value, on which any . . . insurance payments would depend, at the relative pittance of $1,000." Knetsch v. United States, 364 U.S. at 366, 81 S.Ct. at 135, 5 L.Ed.2d at 132. Neither Houston National nor taxpayers received any substantial new funds from this premium/loan duet, played to the tune of the guaranteed annual returns. Houston National received only taxpayers' 4% interest on the "loans" of the guaranteed annual returns, while taxpayers received only substantial interest deductions from the "loans." In no sense can it be said that taxpayers paid any "interest" to Houston National as "compensation for the use or forbearance of money," Deputy v. Du Pont, 1939, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416, which is the standard business test of indebtedness. *See also* Old Colony Ry. Co. v. Commissioner of Internal Revenue, 1931, 284 U.S. 552, 52 S.Ct. 211, 76 L.Ed. 484. We agree with the Tax Court that the sole purpose of the "borrowing" pirouette between taxpayers and Houston National was ". . . taxpayer's desire to obtain the tax benefit of an interest deduction", Goldstein v. Commissioner of Internal Revenue, 364 F.2d at 741, a purpose which, alone and without economic substance, is proscribed by both *Knetsch* and *Cen-Tex*.

In the alternative, the Government alleges that the terms of the 1963 conversions differ so substantially from those of the original 1957 policies that the conversions amounted to a "purchase" of new policies. If the 1963 conversions were "purchases" that took place after August 6, 1963, then any purported interest deductions for the three tax years in question would presumptively fall within the grasp of 26 U.S.C.A. § 264(a) (3), which proscribes deductions on

". . . any amount paid or accrued on indebtedness incurred or continued to purchase or carry a life insurance . . . contract . . . pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of of the increases in the cash value of such contract (either from the insurer or otherwise)." [8]

Like the Tax Court, we do not find it necessary to reach the Government's alternative argument.[9]

---

**8.** 26 C.F.R. § 1.264–4(c) (1) (i) provides that

"[u]nless the taxpayers shows otherwise, in the case of borrowing in connection with premiums for more than three years, the existence of a plan referred to in paragraph (a) of this section [describing Section 264(a) (3), supra] will be presumed."

Taxpayers' annual borrowings after August 6, 1963, the effective date of Section 264(a) (3), would place taxpayers within the statutory presumption for the tax years in question.

**9.** For reasons we do not fully understand, Congress apparently felt that it was plugging a loophole when it passed Section 264(a) (3). The House Ways and Means Committee summarized pre-1963 law as follows:

". . . [U]nder present law, no interest deductions are denied where the taxpayer purchases an insurance contract with the intention of borrowing the maximum amount on the contract each year, unless the contract falls in one of the categories described above [in general, single premium contracts proscribed by Section 264(a) (2) of the Code]."

H.R.Rep.No.749, 88th Cong., 2d Sess. (1964), 1964 U.S.Code Cong. & Admin. News (Vol. 1) pp. 1313, 1369; *see also* S.Rep.No.830, 88th Cong., 2d Sess. (1964), 1964 U.S.Code Cong. & Admin. News (Vol. 1) pp. 1673, 1750. In view of Knetsch v. United States, *supra*; Diggs v. Commissioner of Internal Revenue, 2 Cir. 1960, 281 F.2d 326, cert. denied, 364 U.S. 908, 81 S.Ct. 271, 5 L.Ed.2d 224; Emmons and Weller v. Commissioner of Internal Revenue, 3 Cir. 1959, 270 F.2d 294, cert. denied, 364 U.S. 908, 81 S.Ct. 269, 5 L.Ed.2d 223, we do not understand how the Committee drew is conclusion regarding the status of existing law in 1964. The only case supporting the Committee's view was United States v. Bond, 5 Cir. 1958, 258 F.2d 577, which

In sum, taxpayers have produced and directed a choreography of some stylistic contrivance and ingenuity. It appears that taxpayers' dance with Houston National was not an arms-length cha-cha after all, but rather a clinched two-step. Like the Tax Court, we conclude that taxpayers' performance at its outset should have been declared a turkey and trotted off the stage of tax deductibility. The judgment of the Tax Court is affirmed.

Affirmed.

---

was expressly disapproved by the Supreme Court in Knetsch v. United States, *supra.* Needless to say however careful the House Ways and Means Committee usually is with regard to tax matters, *see* Hart & Sacks, The Legal Process (temp. ed. 1958), we are not bound by the Committee's interpretation of previously existing law.