RUFUS C. SALLEY AND BEULAH S. SALLEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4852-68. Filed March 15, 1971.

*J. L. Rothchild*, for the petitioners.
*Arthur B. Bleecher*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined deficiencies in petitioners' Federal income tax for 1964, 1965, and 1966 in the amounts of $6,264.77, $7,368.09, and $8,883.11, respectively. The only issue presented for decision is whether certain payments made by petitioners to Houston National Life Insurance Co. during the years in issue are deductible as interest under section 163(a),[1] business expenses under section 162(a), or expenses paid for the production of income under section 212(1).

FINDINGS OF FACT

Rufus C. Salley (hereinafter referred to as petitioner) and Beulah S. Salley (hereinafter referred to as Beulah) were legal residents of Houston, Tex., at the time their petition was filed. They filed joint Federal income tax returns for 1964, 1965, and 1966 with the district director of internal revenue, Austin, Tex.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue.

Since 1920, petitioner has been engaged in the life insurance business. He has been the president, treasurer, director, and principal shareholder of Houston National Life Insurance Co. (Houston National) since its creation, and he continued to serve in those capacities during the years in issue. In addition, he is the president, treasurer, director, and one of the principal shareholders of Sam Houston Life Insurance Co. (Sam Houston). Beulah is an officer and director of Houston National, and a director of Sam Houston.

Under the laws of the State of Texas, every domestic insurance company is required to maintain a minimum amount of insurance, measured either by the number of policyholders and the amount of insurance, or by the amount of gross premiums received. Article 21.45 of the Tex. Ins. Code Ann. (1963) provides, in part:

Art 21.45. Minimum Insurance to Be Maintained by Insurance Companies
Section 1. Every domestic insurance company * * * which is by law required to be licensed by the Board of Insurance Commissioners of the State of Texas, shall maintain in force at all times not less than one hundred (100) Policy Holders or Certificate Holders nor less than Two Hundred Thousand Dollars ($200,000) of insurance which has been written by said insurer or which has been acquired through reinsurance contracts; provided, however, that the provisions of this Act shall not apply to any such insurer which has had paid to it by Policy Holders gross premium income in excess of Fifty Thousand Dollars ($50,000) during its last preceding accounting year, or until two (2) years after its original certificate of authority has been issued; and further provided that the provisions of this Act shall not take effect as to any insurer which has heretofore been issued an original certificate of authority until one (1) year after the effective date of this Act.

This act became effective generally in 1955; however, since Houston National had previously been licensed, the statute did not apply to it until 1 year later.

In 1957, prior to December 24, Houston National had neither the required number of policyholders nor a sufficient face amount of outstanding insurance to comply with the statute. On that date, petitioner and Beulah each contracted with Houston National for life insurance policies on their lives. Each policy provided for $20,000 of ordinary life insurance and contained a provision for a guaranteed annual return (hereinafter GAR). Policy No. 18 on the life of Beulah, who was age 57 at the time of the issuance, and policy No. 19 on the life of petitioner, then age 63, provided for annual premiums of $26,028.20 and $26,389.40, respectively. After petitioner and Beulah purchased these two insurance policies, Houston National had gross annual premium income in excess of $50,000.[2]

---

[2] The total amount of premiums payable annually on these two policies was $52,417.60. Even with those premiums, in none of the years, 1957 through 1966, did Houston National's premium income exceed $54,708.64, the amount of its gross premium income in 1966.

On December 20, 1963, petitioner and Beulah filed requests with Houston National to convert policies numbered 18 and 19 to another policy form, which had been authorized by the Texas commissioner of insurance on November 16, 1962. Houston National approved the request and exchanged policy No. 18 for No. 18R and policy No. 19 for No. 19R.

The new policies recite on their face that they were executed on December 24, 1957. They provide the same face amount of life insurance and call for the same premiums as the original policies. They also contain nonforfeiture provisions for cash and loan values, paidup life insurance, and automatic extended term insurance, all computed on the basis of a 1958 standard mortality table with 3½-percent interest. The following table reflects the cash and loan values per $1,000 provided in each of the policies for 1964, 1965, and 1966:

| Year | Policy No. 18R | Policy No. 19R |
|---|---|---|
| 1964 | $170.33 | $219.06 |
| 1965 | 197.16 | 249.30 |
| 1966 | 223.83 | 278.96 |

The loan values can be borrowed upon the sole security of the policies at interest "not to exceed 5% per annum * * * payable to the end of the current policy year and annually in advance thereafter."

Also included in the new policies are the following revised provisions for the GAR:

GUARANTEED ANNUAL RETURN

Each policy year the Company will credit to the insured a Guaranteed Annual Return of the amount shown for such year in the table of Guaranteed Annual Return Values, provided all due premiums and the full Annual Premium due for the policy year then commencing have been paid in full. Such payments may be applied under any of the options herein provided.

The table of Guaranteed Annual Return Values in each policy provides for a GAR of $25,000; if the GAR is left to accumulate, the total accumulation annually increases by a sum equal to the GAR without any additions for interest or any adjustments for mortality risks. Accordingly, at the end of the 8th, 9th, and 10th policy years (i.e., 1964, 1965, and 1966), the cash values of the total accumulations were $200,000, $225,000, and $250,000, respectively.[3]

Each of the policies contains the following provisions for disposition of the GAR:

[3] Although no interest accrued on the GAR left with the company under the revised policies, 3-percent interest compounded annually accrued on, and was added to, the accumulations under the 1957 policies. Records of Houston National indicate that this interest credit was paid or applied to the benefit of petitioners at the time the policies were revised and reissued in 1963.

GUARANTEED ANNUAL RETURN—Options: Each guaranteed annual return, when due and payable, shall, at the option of the Insured and subject to the following provisions, be:

1. Paid in cash; or
2. Applied toward payment of any premiums; or
3. Left to accumulate to the credit of the policy without interest and withdrawable in cash at any time.

If no option is elected prior to the date a Guaranteed Annual Return becomes due and payable, such Guaranteed Annual Return will be applied by the Company under Option 3.

The policies contain, in addition, the following profit-sharing provisions:

### PROFIT SHARING

This policy shall participate in the surplus earnings of the Company as apportioned by the Board of Directors, beginning not later than the end of the first contract year and annually thereafter while this policy is in force.

These dividends could be (1) paid in cash, (2) applied toward the payment of premiums, (3) applied toward the purchase of paidup insurance, or (4) left to accumulate to the credit of the policy with interest at not less than 3 percent per annum compounded annually. The records of Houston National reflect the following dividends on policies numbered 18R and 19R, respectively:

| Year | Policy No. 18R | Policy No. 19R |
|------|---------------|----------------|
| 1964 | $6,376.90 | $6,465.40 |
| 1965 | 8,152.80 | 8,193.60 |
| 1966 | 9,174.05 | 9,218.18 |

During each of the years from 1957 through 1966, petitioner and Beulah paid the premiums on policies numbered 18, 18R, 19, and 19R. They then borrowed [4] back from Houston National the GAR for each year, and, in some cases, also borrowed additional sums represented by the loan value per $1,000 face amount of insurance. Petitioners annually gave new notes, covering the cumulative amounts of the loans, and paid 4-percent interest in advance for the succeeding year. These notes provided "that there is no personal liability upon the makers * * * for the payment thereof, the sole recourse being against" the policies. The following table reflects the amounts of the loans outstanding in each of the years 1964, 1965, and 1966, and the amounts of interest paid thereon and deducted in petitioners' income tax returns:

---

[4] Respondent contends that no true indebtedness was created by the loans by Houston National, and, as such, no actual interest was paid by petitioner and Beulah since no amount was actually borrowed. To simplify the presentation, we have used the terms borrow, loan, and interest and variations thereof. Use of these terms is not intended to imply that petitioners actually paid interest on indebtedness within the meaning of the applicable statutes.

| Year | Balance due on loans, policy No. 18R | Interest paid and deducted | Balance due on loans, policy No. 19R | Interest paid and deducted |
|------|------|------|------|------|
| 1964 | $201,326.80 | $8,053.07 | $202,129.20 | $8,085.17 |
| 1965 | 227,355.00 | 9,094.20 | 228,518.60 | 9,140.74 |
| 1966 | 252,355.00 | 10,094.00 | 253,518.60 | 10,140.74 |

In the notice of deficiency, respondent disallowed these interest deductions, totaling $16,138.24 for 1964, $18,234.94 for 1965, and $20,234.74 for 1966, citing sections 163 and 264.

### OPINION

To support their claimed deductions for the disputed amounts, petitioners rely upon section 163(a), relating to interest; section 162(a), referring to ordinary and necessary business expenses; and section 212(1), dealing with expenses incurred in the production of income. We hold that none of these sections support the controverted interest deductions to the extent attributable to loans of the "guaranteed annual return," but that section 163(a) permits deductions for the interest paid on the loans to the extent allocable to the life insurance features of the policies.[5]

Section 163(a) provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." The crucial question is whether petitioners' transactions with Houston National created "indebtedness" on which, during the years in issue, they paid "interest" within the meaning of that section.

The term "indebtedness" refers to "an unconditional and legally enforceable obligation for the payment of money." *Autenreith* v. *Commissioner*, 115 F. 2d 856, 858 (C.A. 3, 1940), affirming 41 B.T.A. 319 (1940). The term "interest * * * on indebtedness" means "the amount which one has contracted to pay for the use of borrowed money," *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 560 (1932); "In the business world [this] means compensation for the use or forbearance of money," *Deputy* v. *du Pont*, 308 U.S. 488, 498 (1940). The application of these definitions in tax cases is governed by the economic realities of the transaction rather than the form in which it is cast. *Knetsch* v. *United States*, 364 U.S. 361 (1960); *Salley* v. *Commissioner*, 319 F. 2d 847 (C.A. 5, 1963), affirming a Memorandum Opinion

---

[5] Respondent contends, alternatively, that the revisions made in the policies in December 1963 were so drastic that new policies were, in substance, purchased at that time. On this ground, he contends that the disputed deductions are disallowed by sec. 264(a)(3) which is applicable in respect of policies "purchased" after Aug. 6, 1963. That section proscribes a deduction for "any amount paid or accrued on indebtedness incurred * * * to * * * carry a life insurance, endowment, or annuity contract * * * pursuant to a plan of purchase which contemplates the systematic direct or indirect borrowing of part or all of the increases in the cash value of such contract (either from the insurer or otherwise)." In view of the conclusions which we have reached, we need not pass on this argument except to point out that sec. 264(a)(3) would not forbid the deduction insofar as it relates to the nonsystematic loans against the insurance features of the policies.

of this Court; *United States* v. *Roderick*, 290 F. 2d 823 (C.A. 5, 1961) ; *United States* v. *Salley*, 290 F. 2d 708 (C.A. 5, 1961) ; *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3, 1959), affirming *W. Stuart Emmons*, 31 T.C. 26 (1958) and *Carl E. Weller*, 31 T.C. 33 (1958).

Analysis of the life insurance policies numbered 18R and 19R procured from Houston National reveals that they contain two separate and distinct sets of provisions. One set embodies the elements of ordinary whole life insurance, including provisions for annual premium payments, death benefits, and nonforfeiture benefits, such as cash, loan, paidup, and extended term insurance values, all computed under mortality tables and formulae customarily used in life insurance policies. The other set pertains to the GAR values. Under these provisions of each policy, immediately upon payment of each annual premium, the sum of $25,000 is credited to the policy for the benefit of the insured. This sum may be withdrawn as soon as the premium is paid or may be left to accumulate. None of the GAR provisions are keyed to a mortality table; nor do any of them involve normal life insurance risks. The life insurance portions could have been issued separately, and the GAR provisions could have been attached to any other type of policy such as a term or endowment policy.

Beginning in 1957 and continuing at least through 1966, petitioners annually paid the required premiums on their respective original and revised policies and, in form, allowed the company to retain the GAR in accordance with the third option found in the provisions for its disposition. However, petitioners promptly borrowed the full $25,000 on each policy (plus small additional amounts in some of the years), paying interest in advance for the succeeding year.

While these transactions were cast in the form of loans, we do not think they created any real indebtedness with respect to the $25,000 annually paid in and immediately borrowed under the GAR feature of the policies. For both the company and petitioners, the transactions were paper ones. The charades of exchanges of equal amounts of money were not necessary; the same substantive results could have been accomplished by simple bookkeeping entries. The only purpose of the scheme was to obtain the benefit of a tax deduction.[6] In no sense can it be said that petitioners paid "interest" for "the use or forbearance of money," *Deputy* v. *du Pont, supra* at 498, for, in reality, neither petitioners nor Houston National acquired any new funds

---

[6] Petitioners' annual interest payments exceeded the participating dividends, treated as nontaxable in each of the years before us, but the excess is more than offset by the tax benefits sought from the disputed interest deductions. Respondent offered testimony that the purported dividends are taxable in the sense that they were not merely rebates of excessive premiums, but withdrew a motion to amend his answer to allege a deficiency on this ground when petitioners asserted they were surprised and unprepared to offer available testimony to the contrary.

from the annual GAR premium and loan rituals. Petitioners assumed no personal liability for repayment of the amounts purportedly borrowed. Since the total amounts of the annual loans attributable to the GAR are always precisely equal to the accumulated GAR values, the loans, to the extent applicable to the GAR, could be paid at any time without affecting the life insurance features of the policies simply by applying those values to the loans. In other words, the loan liabilities "could be wiped out merely by a set of book entries, and without any money changing hands." *Goldman* v. *United States*, 273 F.Supp. 137, 141 (W.D. Okla. 1967), affd. 403 F.2d 776 (C.A. 10, 1968); see also *Carpenter* v. *Commissioner*, 322 F.2d 733 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court. The purported loans of the GAR thus had no economic substance, and the annual interest payments, to the extent applicable to the GAR feature, do not represent "interest * * * on indebtedness" within the meaning of section 163(a).

In an attempt to support the deductions for interest paid on the loans, including the portion attributable to the GAR, petitioners rely upon *Campbell* v. *Cen-Tex, Inc.*, 377 F.2d 688 (C.A. 5, 1967). They argue that the transactions had a business purpose as well as economic significance and that the interest payments, therefore, qualify as deductions. We disagree. In *Cen-Tex*, the taxpayer, a corporation, procured insurance policies on the lives of its key employees and shareholders to assist in meeting its obligations under its deferred-compensation plan and its obligation to purchase and redeem the stock of deceased shareholders; it prepaid four annual premiums, discounted at 3 percent, and then borrowed the loan value on each of the policies at 4 percent. The court allowed the interest deduction, pointing out that the policies served a bona fide business purpose and that, under the facts, even if the borrowing was continued over a long term, the policies would have substantial economic value. Cf. *Goldman* v. *United States*, *supra*; *Jack E. Golsen*, 54 T.C. 742 (1970), on appeal (C.A. 10, May 4, 1970).

With regard to the business purpose of the policies, we do not think the present case is analogous. Petitioners assert that Houston National needed these large premium collections to retain its license. Even assuming the correctness of this assertion,[7] however, it does not bring petitioners' case within the reasoning of *Cen-Tex*. Houston National's license rather than that of petitioners was allegedly at stake, and the

---

[7] Respondent argues that Houston National had a reinsurance treaty with Sam Houston, both companies being controlled by the petitioners, and that the requirements of art. 21.45, Tex. Ins. Code Ann. (1963), could have been met through reinsurance arrangements; in this connection, respondent notes, Houston National's insurance in force dropped inexplicably immediately prior to the issuance of the disputed policies.

business purpose of a corporation cannot be equated with that of its shareholders. *Deputy* v. *du Pont, supra* at 494; *United States* v. *Fewell*, 255 F.2d 496 (C.A. 5, 1958); *Walton O. Hewett*, 47 T.C. 483 (1967).

While the factual situations of *Cen-Tex* and the present case would be more nearly analogous if Houston National were claiming interest on loans against policies which it had taken out on the lives of petitioners, this still would not justify the loans of the GAR. It was the collection of the premiums rather than the borrowing of the GAR values that was necessary to the retention of the insurance license; indeed, even if petitioners needed the cash to pay the GAR premiums, they were entitled to withdraw the GAR and use it for this purpose.

Nor do the GAR features of these policies meet the economic-reality test applied in *Cen-Tex*. In that case, economic substance was found in the policies' potential death benefits and increasing cash surrender values. In the present case, in contrast, the separable, artificially contrived GAR, which could be withdrawn the day the premiums were paid, had no true economic substance; it involved little more than a bookkeeping arrangement. The GAR provisions do not acquire economic significance from their mere inclusion in policies containing ordinary life insurance contracts.

We conclude that petitioners are not entitled to deductions for interest on the loans attributable to the GAR values, i.e., interest purportedly paid on $200,000 in 1964, $225,000 in 1965, and $250,000 in 1966.

As to the remainder of the loans, i.e., those portions attributable to the life insurance features, we think petitioners are entitled to interest deductions. The obligation on a life insurance policy loan is unique in the sense that the borrower assumes no personal liability, and the insurance company looks only to the cash surrender values for repayment of the loans. Nevertheless, this Court has recognized that the borrower becomes obligated in a sense to pay interest, and such obligation is sufficient to support a deduction for income tax purposes. The interest is "in fact and in law a charge against [the borrower's] rights in the policies." *Murray Kay*, 44 T.C. 660, 672 (1965); *J. Simpson Dean*, 35 T.C. 1083 (1961). Accordingly, we hold that petitioners are entitled under section 163(a) to deduct the interest on those portions of the loans attributable to the life insurance reserves.

Alternatively, petitioners contend that the interest expenses were incurred in connection with the trade or business of petitioner in serving as a corporate officer of Houston National, and that they are, therefore, deductible under section 162(a).[8] While interest payments may

[8] SEC. 162. TRADE OR BUSINESS EXPENSES.
(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

904

be deductible under this section for certain purposes, *McNutt-Boyce Co.*, 38 T.C. 462 (1962), affirmed per curiam 324 F.2d 957 (C.A. 5, 1963), acq. 1966-2 C.B. 6, we think such payments are deductible only if made with respect to true indebtedness; in other words, such an expense would not be deductible as a business expense if made with respect to transactions which, like the present ones, lack economic reality. Moreover, as pointed out above, even if petitioners' premium outlays were needed to permit Houston National to meet the requirements of articles 21.45 of the Tex. Ins. Code Ann. (1963), there is no showing that the interest payments themselves were necessary; if petitioners had exercised the option to have the GAR paid to them rather than left with the company and borrowed, no interest expense would have been incurred.

Nor is there any merit in petitioners' reliance on section 212(1). That section has neither the purpose nor the effect of enlarging the area of allowable deductions; it "provides for a class of deductions coextensive with 'business' deductions but for the requirement that the income-producing activity be a trade or business. * * * It merely enlarged the category of incomes with respect to which expenses are deductible." *Walton O. Hewett, supra* at 487. We have no evidence on whether Houston National was paying dividends on its stock or even producing income, or whether petitioner believed that it had any real prospect of ever doing so; and, as previously noted, even if the premium payments were necessary to the retention of Houston National's license, there is no evidence that the borrowing charade affected the company's status.

*Decision will be entered under Rule 50.*