HERMAN H. AND CECLIA C. ANDERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Anderson v. Commissioner
Docket No. 536-73
United States Tax Court
T.C. Memo 1975-302; 1975 Tax Ct. Memo LEXIS 71; 34 T.C.M. (CCH) 1321; T.C.M. (RIA) 750302; October 1, 1975, Filed Donald J. Forman and R. M. Ginsberg, for the petitioners. John W. Dierker, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year 1968 in the amount of $ 261,388. The issues presented for decision are (1) whether a $ 500,000 payment by petitioners should be regarded as prepaid interest or a down payment and (2) if the payment represents interest, whether petitioners are entitled to deduct the entire sum in 1968 or whether the deduction for such interest should be spread over the 30-month period covered by the payment. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. Herman H. and Ceclia C. Anderson, husband and wife, resided in Dallas, Texas at the time their *73 petition was filed. Petitioners filed their 1968 income tax return with the district director in San Francisco, California. They prepared their income tax returns on the cash receipts and disbursements method of accounting. [1]
Shortly after the end of World War II, petitioner entered the business of building homes. He later became engaged in real estate activities generally, owning and operating a number of townhouses, apartment projects, and high rise apartment buildings. Petitioner conducted his real estate business from Dallas, Texas, and most of his rental properties were located in the Dallas area. In June 1968, petitioner moved to Hillsboro, California, about 15 miles south of San Francisco, intending to continue his real estate activities there. Accordingly, petitioner opened an office in nearby San Mateo, California. Shortly after moving into his new offices, petitioner was contacted by Sam Butler (Butler), who introduced himself as a vice-president and appraiser for Lytton Savings and Loan *74 Association of Northern California (Lytton). [2] Butler asked for an appointment with petitioner to discuss investment in real estate. During the subsequent meeting petitioner expressed an interest in purchasing Adobe Wells, a mobile home park in Sunnyvale, California. The AdobeWells property had been acquired by Lytton as an investment in 1965. At the time of its acquisition, this property was a vacant field. In 1967, however, Lytton began to develop the property into a mobile home park. In conjunction with the meeting, Butler furnished petitioner with a pro forma statement on the AdobeWells property setting forth a suggested purchase price, interest rate, maturity date and prepaid interest set at $ 500,000. Several days thereafter, petitioner went with Butler to inspect AdobeWells. At that time the first phase of the project was nearly complete and petitioner was impressed with the property. After this initial *75 inspection, petitioner visited the property with his family and spent about 10 days checking the business ramifications of the acquisition. Petitioner then contacted Butler to tell him that he would like to enter into negotiations to purchase AdobeWells. On August 2, 1968 petitioner entered into an agreement with Lytton entitled "Letter of Intent," in which Lytton expressed the intent to sell AdobeWells to petitioner. The purchase price was put at $ 2,700,000 with approximately $ 500,000 of prepaid interest. The agreement also contained the following provision. Both parties intend to execute a more formal agreement within 25 days, but if such an agreement is not executed for any reason, this letter of intent shall be null and void. In August 1968, after the signing of the Letter of Intent, Lytton was offered the sum of $ 2,858,000 for the trailer park by Lee Brandenburg, a developer who had previously developed several other mobile parks in northern California. Subsequently, petitioner offered to increase the $ 2,700,000 sales price tentatively agreed to in the Letter of Intent to $ 2,858,000. Additional negotiations and conversations took place between the parties at least *76 through November 27, 1968. The final contract between the parties entitled "Agreement for Purchase and Sale of Real Property" (Agreement) was dated December 27, 1968 and established a purchase price of $ 2,995,000. [3] The Agreement called for a cash down payment of $ 30,000, the balance of $ 2,965,000 was represented by a promissory note bearing interest at the rate of 7 percent per annum from the date of the note. The Agreement also contained the following clause with respect to prepayment of interest: Buyer shall prepay interest on the said Note in the sum of FIVE HUNDRED THOUSAND and no/100 DOLLARS ($ 500,000.00), which sum shall be deposited into the sale/purchase escrow by Buyer together with appropriate instructions to disburse the said funds to Seller at the close of escrow. Said prepayment of interest is an express condition precedent to this Sale and Purchase Agreement. Following close of escrow and the payment of said prepaid interest by Buyer, said prepaid interest shall be deemed fully earned by Seller, and shall not be refunded by [sic] Buyer for any reason whatsoever. In the event of default under said Note and Deed of Trust by Buyer and foreclosure by Seller, Seller *77 may apply said prepaid amounts as it shall determine in its sole discretion. The $ 500,000 prepayment represented approximately 30 months of interest. The closing took place on December 30, 1968. Petitioner deducted the entire $ 500,000 on his 1968 tax return as an interest expense. Lytton had been anxious to sell the AdobeWells property and also desired to receive prepaid interest as part of the deal. At the time Lytton was negotiating with petitioner, Lytton's financial situation was weak. During the early 1960's, Lytton's deposit side was very active. In investing these deposits, Lytton made a number of high risk loans, and experienced a substantial number of foreclosures. During 1966, 1967, and 1968, Lytton had several hundred foreclosures involving over $ 30,000,000 in properties. By mid-1968, therefore, Lytton was experiencing serious income and cash flow problems. These financial difficulties were accentuated by the corporate problems of its parent, Lytton Financial Corporation. As the bank's financial problems became more widely known, it was also faced with the problem *78 of heavy withdrawals. Finally, Lytton was under pressure from the Federal Home Loan Bank Board and the state regulatory agency to improve its financial condition. As part of the effort to strengthen its financial position, Lytton was in the process of selling many of its real estate owned properties (REO's). These REO's consisted of properties it had acquired through foreclosure or properties like AdobeWells which were purchased for investment. Lytton employed two full-time salesmen during 1967 and 1968 to sell the REO's. In the transactions employing prepaid interest, it was normal for the salesmen to propose to the prospective purchaser the price, terms, and the amount of the prepaid interest. Prepaid interest benefitted Lytton by improving its cash flow, and since Lytton was on the cash method of accounting, the prepaid interest could be taken into income, thereby improving its profit and loss picture. [4] In addition, prepaid interest decreased the chances of default by the buyer-borrower, since interest constituted the largest part of each cash installment in the early years of the loan. *79 Prior to the AdobeWells transaction there were as many as 20 prepaid interest deals closed by Lytton. Other prepaid interest transactions were consummated after the sale of AdobeWells. In 1968, the year of the AdobeWells sale, petitioner's return reflected an adjusted gross income of $ 652,894.36. [5] Petitioner's income in prior years fluctuated widely, with net operating losses from his real estate business eliminating most of his otherwise taxable income. [6] The effect of these losses in the 4 years preceding the year in issue is reflected by the following table: 1964
1965
1966
1967
Totals
1964 NOL
[923,212.65)
(923,212.65)
1965 NOL
[255,814.96)
(255,814.96)
1966 Net
Income
$ 125,629.12
125,629.12
1964 NOL
applied
125,629.12
(125,629.12)
1966 Net
income after
loss
0
1967 Net
Income
$ 932,488.15
932,488.15
1964 NOL
applied
797,583.53
(797,583.53)
1965 NOL
applied
134,904.62
(134,904.62)
1967 Net
income after
loss applied
0
Balance
on 12/31/67
of NOLs $ 0
[120,910.34)
0
0
[120,910.34)
*80 OPINION Petitioner takes the position that he is entitled to deduct the entire 30 months of prepaid interest in 1968, arguing that this treatment is consistent with the cash receipts and disbursements method of accounting and that it does not result in a material distortion of income. Respondent, on the other hand, contends that petitioner is not entitled to a $ 500,000 interest deduction since this amount did not represent interest but was actually a down payment. If this Court determines that the $ 500,000 paid by petitioner on the AdobeWells property was in fact interest, respondent argues alternatively that the deduction should be prorated over the years covered by the payment. Section 163 [7] provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." At the outset, we are convinced that $ 500,000 was actually paid by petitioner in 1968. Our inquiry into the applicability of section 163 does not end here however. We recognize that the mere fact of payment by petitioner is, in itself, insufficient to support a deduction, *81 since the payment may represent a variety of things, including a down payment or deposit, as well as a prepaid interest expense. See United States v. Consolidated Edison Co. of N.Y.,366 U.S. 380 (1961). Respondent contends that the $ 500,000 payment represented an additional [8] down payment on the property. Petitioner has characterized this amount as interest throughout his dealings with Lytton. Needless to say, the taxpayer's characterization of a payment of interest will not be recognized unless it reflects the economic realities of the transaction. After examining the economic realities here we have concluded that the $ 500,000 paid by petitioner was in fact interest. The record makes it quite clear that the $ 500,000 payment was compensation for the use or forbearance of money and thus constituted interest within the meaning of section 163. Deputy v. DuPont,308 U.S. 488, 498 (1940); L-R Heat Treating Co.,28 T.C. 894, 896 (1957); Rufus C. Salley,55 T.C. 896, 900 (1971). Respondent cites our decisions in Norman Titcher,57 T.C. 315 (1971) *82 and Kenneth D. LaCroix,61 T.C. 471 (1974) as support for his treatment of the $ 500,000, as a down payment. Both these decisions, however, are readily distinguishable from the instant case. In Titcher, we found that there was no valid existing indebtedness at the time payment was made and therefore no sum upon which interest could accrue. By contrast, the $ 500,000 paid by petitioner was tendered pursuant to an existing and legally enforceable obligation. Once the closing took place on December 30, 1968, petitioner obligated himself to pay 7 percent interest on the unpaid portion of the purchase price. LaCroix is likewise inapposite. In that case the sales contract provided that the so-called "prepaid interest was creditable against the principal amount of the purchase price." We held there that the payment was only a deposit or down payment on the principal. Here, however, the contract price was undiminished by the prepayment. The $ 500,000 sum was paid solely to cover approximately the first 30 months of interest. We therefore hold that the $ 500,000 payment represented a deductible interest expense under section 163. Respondent, citing his authority *83 under section 446(b), contends alternatively that petitioner must spread his $ 500,000 interest deduction over the term for which this interest was paid. Section 446(a) provides that: (a) General Rule.--Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. Deductions are to be taken in the taxable year which is proper under this accounting method. Section 461(a). These rules are qualified, however, by section 446(b) which provides that if the method used does not clearly reflect income, the Commissioner may compute the taxable income under a method which does clearly reflect income. In doing so, respondent need not change the taxpayer's overall method of accounting, but can change the accounting treatment of a particular item. Section 1.446-1(a), Income Tax Regs.Andrew A. Sandor,62 T.C. 469 (1974), a reviewed opinion on appeal to the Ninth Circuit; G. Douglas Burck,63 T.C. 556 (1975), on appeal to the Second Circuit; James V. Cole, 64 T.C. - (Sept. 25, 1975). Respondent has broad discretion in determining whether the taxpayer's accounting *84 method clearly reflects income. Commissioner v. Hansen,360 U.S. 446 (1959); Fort Howard Paper Co.,49 T.C. 275 (1967); Photo-Sonics, Inc.,42 T.C. 926 (1964), affd. 357 F. 2d 656 (9th Cir. 1966); Andrew A. Sandor,supra;G. Douglas Burck,supra;James V. Cole,supra. Moreover, in order to overcome respondent's determination in this area, the taxpayer must establish that the respondent has abused his discretion. Fort Howard Paper Co.,supra;Michael Drazen,34 T.C. 1070 (1960). In making his determination that petitioner's method of accounting for his interest prepayment resulted in a material distortion of income and therefore did not clearly reflect income, respondent relies on Rev. Rul. 68-643, 1968-2 C.B. 76. [9] We have declined to place a stamp of approval on everything said in that ruling or on the application of that ruling to all cases. Andrew A. Sandor,supra;G. Douglas Burck,supra;James V. Cole,supra. See Estate of Grace E. Lang, 64 T.C. - (June 12, 1975). *85 The approach of this Court has been to take into account all of the surrounding relevant facts and circumstances. Nevertheless, after reviewing the salient facts here, we have concluded that petitioner's $ 500,000 interest deduction in 1968 resulted in a material distortion of income, and does not, therefore, clearly reflect income for that year. The $ 500,000 interest deduction had a significant impact on petitioner's income for 1968. If this deduction were not taken into account, petitioner's taxable income would be $ 351,614 including the remaining $ 120,914 net operating loss carryover. With the deduction allowed in full for 1968, petitioner would have a net loss of $ 27,476. Due to net operating losses, petitioner *86 had no taxable income in the preceding 2 years. In addition, we note that although only a few days in the 30-month prepayment period fell in 1968, the entire $ 500,000 interest payment covering a full 30 months was taken in 1968. On the basis of these facts, we feel that taking the entire deduction in that year had the effect of materially distorting his income. Petitioner, nevertheless contends that the clear reflection of income language contained in section 446(b) applies only to the method of accounting used by the taxpayer and not the timing of a particular deduction. His argument proceeds as follows: The clear reflection of income language, as it applies to deductions, first appeared in section 200(d) of the Revenue Act of 1924. This section read: (d) * * * The deductions and credits provided for in this title shall be taken for the taxable year in which "paid or accrued" or "paid or incurred", dependent upon the method of accounting upon the basis of which the net income is computed under section 212 or 232, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period. [10]
*87 Section 200(d) became section 43 of the 1939 Code, without significant alteration. Section 43 of the 1939 Code in turn, became section 461, but the clause reading "unless in order to clearly reflect the income, the deductions or credits should be taken as of a different period" was dropped from the new section. Petitioner concludes that by not including the "unless" clause, Congress eliminated the clear reflection of income requirement with respect to the timing of deductions. Congress, however, made it clear that section 461 carried over the provisions of section 43 of the 1939 Code without any substantive change. The House and Senate Committee reports noted that: Section 461 adopts the provisions of section 43 of the 1939 Code in rearranged form. The timing of deductions and credits * * * is determined by the taxpayer's method of accounting. The method must clearly reflect the income of the taxpayer. [H. Rept. No. 1337, 83d Cong., 2d Sess., (1954) p. A-161; S. Rept. No. 1622, 83d Cong., 2d Sess. (1954) p. 305). [Emphasis added.] Moreover, petitioner's argument that section 446(b) applies only to the taxpayer's method of accounting, and not his timing of deductions has *88 been squarely rejected by Sandor. We said: It seems obvious from the committee reports that Congress, despite the deletion of the "unless" clause, intended that the timing of the deductions would continue to be subject to the requirement that the method of accounting for that deduction should clearly reflect income. [62 T.C. at 478-9]. Petitioner's argument was also rejected in Burck and Cole. It is our conclusion that in view of section 446(b) Congress considered the "unless" clause in section 461 to be superfluous, and intended no change by eliminating it. Petitioner distinguishes his case by alleging he had no tax avoidance motives. He contends that he was completely unaware of any tax benefits that he might derive from prepaid interest, and that the first time he had ever heard of prepaid interest was while he was negotiating for the sale of AdobeWells. [11] Petitioner's contention, even if true, does not afford him much help. While we have recognized that material distortion of income is more likely to take place in a tax avoidance context justifying special scrutiny, it is by no means limited to such circumstances. A taxpayer can no more report *89 his income on a basis that fails to clearly reflect income than he can deduct a personal item. The fact that he happens to stumble on an impermissible tax benefit does not make it permissible if contrary to the statute. [12]
*90 We therefore find that petitioner's deduction of the entire amount of the prepaid interest in 1968 resulted in a material distortion of income, which does not clearly reflect income. We hold that of the $ 500,000 interest paid only the amount attributable to 1968 may be deducted in that year, with the remaining amount being spread ratably over the period covered by the payment. Decision will be entered under Rule 155.
Footnotes
1. Since Ceclia C. Anderson is a party to this proceeding only by virtue of having filed a joint return with her husband, Herman H. Anderson will be referred to as petitioner.↩
2. Lytton Savings and Loan was a subsidiary of Lytton Financial Corporation. The name of the bank was subsequently changed to Equitable Savings and Loan Association of California, and Equitable was subsequently acquired by Great Western Savings and Loan of California.↩
3. The increased purchase price was attributable to the construction costs for additional pads.↩
4. Lytton reported the entire $ 500,000 payment as interest income in its corporate tax return for 1968.↩
5. Petitioner's return showed a net loss of $ 28,491. Respondent revised petitioner's return to show taxable income of $ 472,524. In addition to the disallowance of a $ 500,000 interest expense for 1968, respondent disallowed a legal expense amounting to $ 1,015. The deductibility of the legal expense is not at issue here. ↩
6. The bulk of petitioner's income was derived from the sale of property.↩
7. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
8. Both parties agree that $ 30,000 paid by petitioner at the closing was a down payment.↩
9. By its own terms the ruling provides that it will not apply to interest prepayments arising out of an obligation incurred prior to November 26, 1968, the effective date of the ruling. Petitioner has apparently abandoned his argument that he incurred a legal obligation to prepay interest prior to that date. In any event, we believe it is quite clear from the record that there was no legal obligation to purchase the AdobeWells property as of November 26, 1968.↩
10. The Ways and Means Committee provided the rationale for this section: (2) In subdivision (d) of this section authority is granted to the Commissioner to allow or require deductions and credits to be taken as of a year other than that in which "paid" or "accrued" when, in his opinion, it is necessary in order to clearly reflect the income. * * * The necessity for such a provision arises in cases in which a taxpayer pays in one year interest or rental payments or other items for a period of years.↩ If he is forced to deduct the amount in the year in which paid, it may result in a distortion of his income which will cause him to pay either more or less taxes than he properly should. [H. Rept. No. 179, 68th Cong., 1st Sess. (1924) pp. 10-11, 1939-1 C.B. (Part 2), 241, 249.] [Emphasis added.]
11. Petitioner's portrayal of himself as ignorant of the tax consequences of the transaction is not easy to accept. We find it difficult to believe that a man engaged in as many real estate transactions as petitioner did not know about the then common practice of prepaying interest. Moreover, the record casts some doubt on petitioner's assertion that he knew nothing about prepaid interest. A letter (dated August 27, 1968) to James E. Kemp of Lytton and carrying petitioner's signature block contained the following language with respect to prepaid interest: [We] have rejected other acquisitions utilizing prepaid interest since then and now find that these other purchases are no longer available to us. We are depending upon your mobile home park purchase for the utilization of the expenditure of the $ 500,000 prepaid interest. The letter, which was stipulated into evidence, was a carbon copy without an actual signature. Petitioner claims that he did not write or authorize the letter. In viewing the overall contents of the letter and its importance in the negotiation for AdobeWells, we have concluded that if it was not written by petitioner for himself, it was written by someone acting as an agent for petitioner. Additionally, the August 2, 1968 Letter of Intent provided that the agreement is "subject to Marvin Starr's approval as to tax consequences." Although petitioner denies receiving any tax advice from Starr or anyone else regarding the AdobeWells transaction this is difficult to believe on the basis of the record before us. Moreover, in assessing the degree to which petitioner was knowledgeable about the tax consequences of prepaid interest, we think it appropriate to look to petitioner's income in the year the prepaid interest was paid. The fact that petitioner had a particularly high income year in 1968 does not, on the record before us, strike us as wholly coincidental. ↩
12. Petitioner also argues that it was Lytton, rather than petitioner who insisted on the prepayment of interest. Again, the bank's situation is irrelevant in determining whether or not petitioner's own income is clearly reflected.↩