**Howard F. DRAKE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. C–83–76–G.

United States District Court, M.D. North Carolina, Greensboro Division.

Nov. 27, 1984.

Michael C. Stovall, Jr., Greensboro, N.C., for plaintiff.

Richard F. Mitchell, Atty., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

GORDON, Senior District Judge.

This income tax refund suit came before the Court for trial on October 10, 1984. Plaintiff taxpayer Howard F. Drake (Drake), formerly an employee of a tax-exempt section 501(c)(3)[1] organization, had, during this employment, participated in a tax-sheltered section 403(b) annuity program. Under this program, Drake directed that a certain amount of his salary be paid as premiums directly to the annuity company and, under section 403(b)(1), these premium amounts were excluded from Drake's gross income. On December 15, 1978, pursuant to the loan provisions of his annuity policy, Drake obtained a $4,928.52 payment to alleviate a personal financial emergency. Drake, having been informed by the annuity company that the payment was taxable income, (Plaintiff's Ex. # 9), included the amount as such on his 1978 federal income tax return and accordingly paid tax of $1,320.04 thereon. Drake later filed a timely refund claim which was disallowed by the Internal Revenue Service (IRS) and thereafter timely commenced this suit on February 1, 1983.

Drake contends that the $4,928.52 represented a bona fide loan from his annuity policy and thus not taxable income to him. Conversely, the IRS argues that under the literal language of the 1978 version of section 72(e)(1)(B)[2] and Rev. Ruling 81–

---

1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue.

2. Section 72 was amended by section 265(a) of the Tax Equity & Fiscal Responsibility Act (TEFRA) of 1982, Pub.L. No. 97–248, 96 Stat. 324 (codified as amended at 26 U.S.C. § 72(e) (1984)). However, Plaintiff posited and the IRS conceded that the pre-TEFRA language of section 72(e)(1)(B) applies to this suit which stems from a 1978 loan and tax return. The Court did find, in considering this point, that the provi-

sions of post-TEFRA section 72(e)(5)(A), (B) & (D)(ii)(III) could be read as applicable to the subject case. However, the issue presented with the facts at hand in the context of pre-TEFRA section 72(e)(1)(B) and, alternatively, the more detailed provisions of post-TEFRA section 72(e)(5)(A) through (e)(6) differs only semantically, not substantively. In essence, the Court is still left to decide, for all 403(b) annuity plans, I.R.C. § 72(e)(5)(D)(ii)(III) (1984), commenced before August 14, 1982, I.R.C. § 72(e)(5)(B) (1984), whether the "amounts received under the contract [are] excludable from gross in-

126, 1981–1 C.B. 206, this alleged loan was an "amount received under an annuity..., [though not] as an annuity" and thus is taxable to Drake. This Court, following the Tax Court decision in *Minnis v. Commissioner*, 71 T.C. 1049 (1979), and the apparent Congressional intent embodied in the statutory scheme of sections 501(c)(3), 403(b) and 72(e)(1)(B), concludes that the amount received by Drake is a valid indebtedness which was not taxable income to him when received. Accordingly, it is concluded that judgment should be entered for the Plaintiff in the amount of $1,320.04 plus interest. Further, it is the finding of the Court that the Government's position was "substantially justified", 28 U.S.C. § 2412(d)(1)(A) (1984), and thus Plaintiff's claim for reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 (1984), should be denied. The issue of attorney's fees was left open at the conclusion of the trial. However, it is apparent from the facts and discussion which follows that the Government's action was not unreasonable. Complicated facts and law are involved. Genuine issues were presented for decision.

## FACTS

The Plaintiff, Howard F. Drake, is an individual now residing in Greensboro, North Carolina. From November, 1970 until the office's closing in January, 1982, he was employed with the Low Income Housing Development Corporation of North Carolina (LIHDC), a charitable organization exempt from federal income tax under section 501(c)(3). On February 1, 1975, he voluntarily entered an annuity purchase plan (annuity plan) under which the LIHDC paid as premiums to the Pilot Life Insurance Company of Greensboro, North Carolina (Pilot) an amount designated by Drake to be deducted from his periodic salary. Under section 403(b) these premium payments, although deducted directly from Drake's salary at his direction, were excluded from his gross income.

The following table shows the amounts Drake had deducted from his salary and paid as premiums to Pilot's annuity plan:

| Year | Monthly Contribution | Annual Total |
|---|---|---|
| 1975 | $ 75.00 | $ 900.00 |
| 1976 | 100.00 | 1,200.00 |
| 1977 | 125.00 | 1,500.00 |
| 1978 | 115.00 | 1,380.00 |
| 1979 | 157.00 | 1,884.00 |
| 1980 | 157.00 | 1,884.00 |
| 1981 (thru July)[3] | 157.00 | 1,099.00 |

Pursuant to the policy loan provisions of the annuity contract, on December 15, 1978, Drake obtained from Pilot a loan[4] in the amount of $4,928.52. Drake needed these funds to pay off a note for which he was the co-maker which, due to his fellow co-signer's neglect, was in default. Drake had secured the note with a deed of trust on his personal residence and thus was faced with a clear and present financial emergency. The balance due on the note totaled $5,000.00 and, to meet this, Drake first "made efforts to borrow the money from others (banks & financial institutions) but could not." (Drake's Testimony). Thus, Drake resorted to his Pilot annuity plan to obtain the necessary financing. The very favorable 6 per cent interest rate on a policy loan undoubtedly weighed heavily in his decision.

The loan provisions to which Drake turned provide, in its entirety:

come." I.R.C. § 72(e)(1)(B) (1978) and I.R.C. § 72(e)(6)(B) (1984) (identical language in each statute). Thus, having noted this and recognizing that the same issue and result would be yielded by application of the 1984 statutory language of § 72(e)(5), the Court concludes that it will base its resolution on the 1978 Internal Revenue Code provision. In the vernacular, a rose, however thorny, is a rose by any other name.

3. Although Drake was employed by the LIHDC through January, 1982, based on all the evidence before the Court, it must conclude that Drake made no annuity contributions after July, 1981.

4. Although to say "loan" begs the question in this case, the Court does so for simplicity of wording.

## LOANS

While this policy is in force and before annuity payments begin, the Company, upon receipt of a satisfactory loan agreement, will grant loans on the security of this policy. The maximum amount of such loans is the amount which with interest thereon to the end of the current policy year will not be more than the guaranteed cash value plus the cash value of any dividend additions available at the end of the current policy year.

The Company may defer the granting of a loan for the period permitted by law not exceeding six months except for loans to pay premiums to the Company. The loan may be repaid in full with accrued interest, or in part, at any time while this policy is in force and before annuity payments begin, provided payments are made of not less than Ten Dollars each. Interest on such loan shall be at the rate of 6% per annum and will be payable on each subsequent policy anniversary date. If interest is not paid when due, it shall be added to the existing loan and will bear interest at the same rate. If and when the total indebtedness, including interest due or accrued, equals or exceeds the guaranteed cash value of this policy plus the cash value of any dividend additions, and at least thirty-one days prior notice shall have been mailed by the Company to the last known address of the Owner and any Assignee of record, this policy shall terminate and become void. (Plaintiff's Ex. # 1, p. 7).

Although Drake initially sought the full $5,000.00 from Pilot, under these policy terms, he could only receive an amount equal to, basically, the guaranteed cash value plus any earned but uncredited dividends. So, Drake, by requesting that he receive "as much as [he] could get on loan", (Drake's Testimony), ultimately obtained the $4,928.52 now at issue.

When he received this first loan, on December 15, 1978, Drake was 42. The premiums on the annuity policy are payable until he reaches age 65. On February 1, 2001, that is, the "Anniversary of the Date of Issue nearest the Annuitant's Age 65," (Plaintiff's Exhibit # 1), or the "annuity starting date,"[5] Section 72(e)(1)(A), the annuity payments officially will begin. It is concluded that, during 1978, Drake did not begin to receive installments or periodic payments under the annuity policy.

To complete the facts of the particular transaction here, the Court further finds that, as was suggested to him by Pilot in the letter forwarding his $4,928.52 check, (Plaintiff's Exhibit # 9), Drake included this amount as ordinary income on his 1978 federal income tax return. His total income reported on that return was $24,476.89. Of the total tax he paid on this amount, $1,320.04 was attributable to the amount of the loan.

Subsequent to the filing of his 1978 return, Drake timely filed a refund claim with the IRS for tax paid on his loan. On April 22, 1982, the IRS officially and fully disallowed this claim. (Plaintiff's Exhibit # 6).

As relevant background facts, the Court further finds, first, that Drake from February of 1980 through February of 1982 obtained four additional loans from his Pilot annuity policy. Specifically, on February 20, 1980, Drake received $1,843.60, January 21, 1981 $1,000.00, May 15, 1981 $1,000.00, and February 19, 1982 a final loan of $1,700.36. This final loan was necessitated, according to his uncontradicted trial testimony, by his then unemployed status. The three immediately preceding loans were required by Drake to meet other "personal financial needs" which he could not specifically recall at trial. It is also concluded that at least in receiving the first, second and fifth policy loans, Drake obtained the maximum loan amount available to him at the respective times.[6]

---

5. This term is defined in section 72(c)(4).

6. As noted, Drake had requested $5,000.00 instead of the $4,928.52 he did receive as his first loan. Also, Drake, before borrowing $1,843.60 in February of 1980, had requested $2,000.00 (Drake's Testimony), and, in seeking the final $1,700.36 loan, he simply asked for the maxi-

**1274**

Second, although as his similarly uncontradicted trial testimony revealed, Drake intends as he always has to repay all the loans, he has not repaid any loan principal nor interest. In fact, he admitted that his decision to repay hinges on the outcome of this litigation. That is, if it is finally determined that his withdrawals are loans, he will repay Pilot; if they are deemed income, he will have paid the IRS for the largest and will owe tax on the remaining payments.

Finally, the Court finds that, despite the several loan withdrawals Drake has secured from his policy and despite his failure to repay any principal or interest, Drake's Pilot annuity plan has not been cancelled but instead increases steadily in value due to the higher return yielded on his equity value vis-a-vis the relatively low interest accumulation on his loan balance. Drake's again uncontradicted testimony highlighted this fact and the more objective records provided by Pilot reveal that on August 6, 1981, Drake, soon after his fourth policy loan, still had a positive equity value in his annuity plan of $1,094.21. (Plaintiff's Exhibit # 11).

## DISCUSSION AND CONCLUSIONS OF LAW

As a threshold matter, the Court concludes that it has jurisdiction, as the parties stipulated, over the subject case under 28 U.S.C. §§ 1340 and 1346(a)(1).

Proceeding to the merits, the issue to be decided can cogently be stated as whether the $4,928.52 received by Plaintiff pursuant to the loan provisions of a tax-sheltered 403(b) annuity plan constitutes taxable income to him under the applicable version of section 72(e)(1)(B). Plaintiff Drake, following *Minnis v. Commissioner*, 71 T.C. 1049 (1979), argues for a negative response while Defendant United States contends that the Court, under Rev. Ruling 81–126, should rule in the affirmative.

In *Minnis* the Tax Court concluded that the public school teacher-taxpayer who had mum loan available to him. (Defendant's Ex-

received a loan under her tax-sheltered 403(b) annuity plan to finance home remodeling had not realized taxable income. Mrs. Minnis borrowed $5,000.00 at 4.8 per cent from her annuity policy while ordinary bank loans charged 9 per cent. The IRS argued that since the premiums were, in effect, paid by the taxpayer's employer, the loan proceeds were income. However, the court, while recognizing the potential for abuse within this statutory framework, found that Mrs. Minnis' transaction was an ordinary loan and could find no basis upon which to rule that Congress intended to tax such annuity borrowing.

Initially, as did the *Minnis* court, this Court concludes and cautions that the subject case did not prompt any argument by the IRS that the loan was without economic substance. Indeed, the Government's counsel in his closing statement admitted that Drake's was a valid policy loan and "not a sham transaction." Thus, the Court is not compelled to consider *Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960), and its progeny. *See Salley v. Commissioner*, 55 T.C. 896 (1971), *aff'd*, 464 F.2d 479 (5th Cir.1972); *Bridges v. Commissioner*, 325 F.2d 180 (4th Cir.1963); *See generally Wachovia Bank & Trust v. United States*, 499 F.Supp. 615 (M.D.N.C.1980) (finding no sham transaction but analyzing *Knetsch* and *Bridges*). Indeed, as in *Minnis*, there is no objective, independent proof that Drake sought to receive tax-free compensation through this or the subsequent loans. Drake borrowed from his annuity plan only after seeking alternative financing and realizing that the interest applicable to commercial loans was twice or more the interest rate available on his policy loans. Upon receiving the loan check, he learned that the payment was thought to be taxable income and he dutifully reported it as such on his return. This reporting and tax payment along with his inescapable recognition—and subsequent IRS confirmation—that such "loans" would at least initially be deemed income negates any conceivable in-

hibit # 14).

tent by Drake to use his annuity plan as a tax evasion scheme. Furthermore, although he has not yet repaid any of the loans, his needy purpose in acquiring at least the loan in issue—to prevent foreclosure on his personal home—is exceedingly more meritorious than Mrs. Minnis' desire to remodel her newly purchased house.

As to the statutory argument which the Government did make, the pertinent language of section 72(e)(1)(B) [7] provides that "if any amount is received under an annuity ... if such amount is not received as an annuity and if [not] received on or after the annuity starting date, [it] shall be included in gross income ... to the extent it exceeds the aggregate premiums paid." The statute further provides that "dividends [8] ... payments in full discharge ... and refund of the consideration paid and any amount received ... upon surrender, redemption or maturity" of the contract all shall be treated as amounts not received as an annuity.[9]

Thus the applicable version of section 72(e) deems basically every conceivable non-annuity payment from an annuity plan *other than* a valid loan to be income to the recipient. So, the key inquiry is whether the $4,928.52 is a bona fide loan or instead "an amount received under, [though not] as an annuity." Section 72(e).

There is no doubt that a policy loan is somewhat unique and, as the *Minnis* court recognized, "differs in some respects from an ordinary loan." *Minnis* at 1054. For example, Pilot apparently had no discretion in providing the loan and no substantive recourse upon which to turn upon a default by Drake.

However, Pilot was adequately secured in and could even delay extension of the loan so the Government's argument of lack of discretion is largely illusory. In addition, Drake's obligation to repay the loans is independently enforced by at least three significant factors. First, the policy, by the terms of the loan provisions, terminates in the unlikely event that the annuitant's total loan balance plus accrued interest exceeds the policy's guaranteed cash value. Second, and more compelling, is the fact that Drake must repay his loans before the regular annuity payments begin or apparently will receive payments lowered commensurately with his outstanding credit balance. Rev. Ruling 81–126, *supra* and *Minnis* at 1056 citing Rev. Ruling 67–258, 1967–2 C.B. 68 (the predecessor to Rev. Ruling 81–126 on precisely the same issue). Finally, but equally as burdensome to Drake, he, upon reaching age 65 with the loans still unpaid, would face a large ordinary income tax liability on the entire amount of his loans with no wherewithal to pay the tax rather than the immensely more favorable scenario of, having repaid the loans, receiving periodic annuity payments to be taxed at his presumably lower

---

**7.** Section 72(e) reads in full:

(e) Amounts not received as annuities.—

(1) General rule.—If any amount is received under an annuity, endowment, or life insurance contract, if such amount is not received as an annuity, and if no other provision of this subtitle applies, then such amount—

(A) if received on or after the annuity starting date, shall be included in gross income; or

(B) if subparagraph (A) does not apply, shall be included in gross income, but only to the extent that it (when added to amounts previously received under the contract which were excludable from gross income under this subtitle or prior income tax laws) exceeds the aggregate premiums or other consideration paid.

For purposes of this section, any amount received which is in the nature of a dividend or similar distribution shall be treated as an amount not received as an annuity.

(2) Special rules for application of paragraph (1).—For purposes of paragraph (1), the following shall be treated as amounts not received as an annuity:

(A) any amount received, whether in a single sum or otherwise, under a contract in full discharge of the obligation under the contract which is in the nature of a refund of the consideration paid for the contract; and

(B) any amount received under a contract on its surrender, redemption, or maturity.

In the case of any amount to which the preceding sentence applies, the rule of paragraph (1)(B) shall apply (and the rule of paragraph (1)(A) shall not apply).

**8.** Section 72(e)(1).

**9.** Section 72(e)(2).

post-retirement marginal rate and to be paid directly from the very payments being taxed.[10] Thus, while the potential for abuse under the pertinent statutory scheme does exist, the Court, which must first acknowledge that the question of proper tax treatment of unpaid loans will be dispositively handled at another time, nonetheless proffers the view that these retirement planning and tax disincentives largely mitigate the potential abuse. *See also Minnis* at 1056–1057.

Perhaps more important to the Court's conclusion today, "for the purposes of determining a taxpayer's Federal income tax liability, policy loans have generally been regarded as a valid form of indebtedness." *Minnis* at 1054. Accordingly, despite the unique qualities of insurance or annuity policy loans, it seems widely recognized that the interest paid on such loans is deductible under section 163. *Minnis* at 1054 (dictum); *Cameron v. Commissioner,* 81 T.C. 254 (1983) (following *Minnis* and others on the deductibility of such interest but distinguishing non-deductible interest payments on redeposits by a federal employee to the Civil Service Retirement & Disability Fund); *Salley,* 55 T.C. at 903; *Kay v. Commissioner,* 44 T.C. 660, 672 (1965) ("the obligation on insurance policy loans is unique … [but] by making the loans, the owner of the policy becomes obligated in a sense to pay interest thereon and … such obligation is sufficient to qualify it as deductible interest."); *Dean v. Commissioner,* 35 T.C. 1083 (1961). It is only logically consistent to, on the one hand, rule that interest paid on annuity policy loans is deductible and, on the other, to conclude that such loans are equally valid debt for the purpose of defining income to the annuitant. Although, as Emerson observed, some consistencies may be "the hobgoblins of little minds," they are, overall, a goal to

which this Court does and the tax laws should strive.

Furthermore, Drake's loan was considered by the parties to be and did constitute "a loan in ordinary parlance." *Minnis* at 1055–56. As did the *Minnis* court, this Court recognizes that "common understanding and experience are the touchstones for the interpretation of the revenue laws. *Id.* at 1056 quoting *Helvering v. Horst,* 311 U.S. 112, 117–118, 61 S.Ct. 144, 147, 85 L.Ed. 75 (1940), but further acknowledges that the definition of relevant commercial terms "in tax cases [is to be] governed by the economic realities of the transaction rather than the form in which it is cast." *Salley* at 900. The subject loan qualifies as such under either test. The "common understanding" of Drake in obtaining the funds, Pilot in its contract and records (Plaintiff's Exhibits #'s 1, p. 7, 7, 8, & 9), and now ultimately this Court is that the payment here was a valid loan. And, because of Drake's implicit obligation to repay, the "economic realities of the transaction" weigh significantly in favor of loan treatment. Thus, it is concluded that Drake's policy loan falls within the common definition of indebtedness as "an unconditional and legally enforceable obligation for the payment of money." *Salley* at 900 quoting *Autenreith v. Commissioner,* 115 F.2d 856, 858 (3d Cir.1940), *aff'g* 41 B.T.A. 319 (1940).

The Court must agree that, even as a valid loan, Drake's would be considered income within a narrow reading of the literal provisions of section 72(e)(1). However, the adoption of such a literal construction is rebutted by two dominant factors. First, section 72(e), by defining and providing examples of those distributions (dividends, premium refunds, redemptions, etc.) to be taxed, at least implies that it provides an exhaustive list.[11] More importantly, the legislative history of new section 72(e) con-

---

**10.** Both parties agreed at trial that this would be the proper tax treatment if all the loans went unpaid.

**11.** The statute is certainly not, as the Government's counsel has argued, "clear that the exam-

ples in section 72(e)(2) are but additional instances for the application of the general rule, and are in no way restrictive or limiting." Defendant's Trial Memorandum, p. 7.

firms this implication by first expressing the Senate's "concern that widespread use of loans ... from tax-sheltered annuities diminishes retirement savings" and then by concluding that "restrictions on loans ... should be applied to all plan participants." S.Rep. 494, 97th Cong., 2d Sess. 319, *reprinted in* 1982 U.S.Code Cong. & Ad. News 1060. In essence, Congress had to, in 1982, treat loans from section 403(b) annuities as income because the statute failed to do so before then. Thus, the new law only substantiates the Tax Court's 1979 appraisal that, for those annuities in effect before 1982, "Congress considered policy loans to be a valid form of borrowing." *Minnis* at 1055.

Congress' omission of any pre-1982 provision deeming 403(b) annuity loans as income is also recognized, again at least implicitly, in the recent case of *Sasser v. Commissioner*, 44 T.C.M. 404 (1982). There, the Tax Court, in deciding that annuity loans under an HR-10 retirement plan were taxable income to the owner-employee recipient, observed that "while as a general rule loan proceeds do not constitute taxable income, even in the case of a loan made against the cash surrender value of an annuity contract, Congress has specifically provided that, in the case of a loan made to an 'owner-employee' by the insurance company with whom such [individual] has established a retirement plan described in section 403(a), the amount of the loan is treated as an amount received under the retirement plan." *Id*, at 408. Because Congress had specifically deemed 403(a) annuity loans to be income, the court so held. However, prior to 1982, Congress had not so decided for 403(b) plan loans and thus this Court must reach the contrary result.

Finally, the Court must acknowledge that its conclusion is also contrary to that in Rev. Ruling 81–126. However, as was so aptly stated in *Estate of Lang v. Commissioner*, 64 T.C. 404, 407 (1975), such rulings are "simply the contention of one of the parties to the litigation, and ... entitled to no greater weight." Having recognized this, the Court leaves the IRS to pursue the consideration it is due in attempting to

"free [this policy loan issue] from doubt." *Minnis* at 1057.

## DISPOSITION

For the foregoing reasons, it is held that the policy loan received by Plaintiff is not an "amount received under an annuity" within the meaning of the 1978 version of section 72(e)(1)(B), and thus the $4,928.52 obtained by Drake was not taxable income to him. Accordingly, judgment shall be entered for Plaintiff in the amount of $1,320.02 plus interest.